NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0366n.06

No. 09-6234

FILED

*May 31, 2011*

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff-Appellee,      )
                                   )
     v.                            )     ON APPEAL FROM THE UNITED
                                   )     STATES DISTRICT COURT FOR THE
JOHN HOPPER,                       )     MIDDLE DISTRICT OF TENNESSEE
                                   )
          Defendant-Appellant.     )


        Before: MARTIN and SUTTON, Circuit Judges; GRAHAM, District Judge.*

        GRAHAM, Senior District Judge.   Defendant-Appellant John Hopper ("Hopper") was convicted by a jury of conspiracy to injure a postal worker engaged in the lawful discharge of his duties, assaulting a postal worker engaged in the performance of his official duties with the intent to commit aggravated robbery, and carrying, using and brandishing a firearm during and in relation to a crime of violence.   On appeal, Hopper raises as error the admission of evidence of other robberies under Fed. R. Evid. 404(b), the denial of his motions for judgment of acquittal and for a mistrial, and the district court's application of the official victim enhancement under the United States Sentencing Guidelines ("U.S.S.G.") at sentencing.   For the following reasons, we affirm.


                                  I.


_____

        *The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

Hopper was charged by indictment filed in the Middle District of Tennessee on November 5, 2008, with conspiracy to injure a postal worker engaged in the lawful discharge of his duties in violation of 18 U.S.C. § 372 (Count One), assaulting a postal worker engaged in the performance of his official duties with the intent to commit aggravated robbery in violation of 18 U.S.C. § 111(a) (Count Two), and carrying, using and brandishing a firearm during and in relation to a crime of violence (the § 111(a) offense in Count Two) in violation of 18 U.S.C. § 924(c). Tony Ridley, his co-conspirator, was also charged in the indictment, but Ridley pleaded guilty and agreed to testify against Hopper.

Prior to trial, Hopper filed a motion in limine seeking to prevent the government from introducing evidence of other robberies allegedly committed by Hopper and Ridley. The government argued that evidence of these other robberies, which were committed within the week preceding the indicted offenses, was background evidence concerning the formation and existence of the conspiracy, and therefore not subject to Rule 404(b). The district court did not accept this argument, but found that the evidence was admissible under Rule 404(b) to prove the identity of Hopper as the robber, and as bearing on his intent and the existence of a plan.

At trial, the government presented evidence concerning the robbery of Eric Schafer while he was working as a letter carrier for the United States Postal Service on February 29, 2008. Schafer, who was wearing his uniform at the time and driving a marked Postal Service vehicle, was delivering mail to mailboxes at an apartment complex located in the White Bridge Road area of Nashville, Tennessee, at approximately 2:15 p.m. when he felt

2

something pressed against the back of his head and heard someone say, "Give me your f'ing money." Schafer turned around to see a gun pointed at his face. He described the robber as a large man, about 6'2" and 250 pounds, wearing black jeans and a black hoodie, with a bandanna covering his face, but he was unable to identify the robber. The robber took his wallet, which contained cash and debit/credit cards, and his cell phone. The robber then fled in a black Nissan with no tags and tinted windows, and Schafer called the police. Schafer spoke with the police for an hour at the scene of the robbery, and then continued on his mail delivery route. His cell phone and debit/credit card were used after the robbery without his authorization.

The robbery was investigated by Postal Inspector Wayne Martin. Based on bank and phone records provided by Schafer, Martin learned that the stolen credit card had been used at a Kroger store and at Citgo and Mapco gas stations. Phone calls were made to a location at 5800 Maudina and to a phone subscribed in the name of Tony Ridley. Martin went to the apartment complex located at 5800 Maudina and observed a black Nissan Altima parked near Apartment J6, which was leased to Lisa Aldridge. The black Nissan was later pulled over in a traffic stop, and the driver was identified as Lisa Aldridge. Martin viewed a video of the Kroger transaction involving the use of the stolen credit card and saw that the woman involved in that transaction was Aldridge. Aldridge was interviewed on March 10, 2008. She provided information concerning what she referred to as the "mailman robbery," which she stated was committed by Ridley and "C-Lo." She admitted using Schafer's

3

credit card and cell phone, and stated that her Nissan was used during the robbery.

Hopper was arrested at his father's house where he resided, and Hopper acknowledged that his nickname was "C-Lo." A black hooded sweatshirt, ammunition and a revolver were found in Hopper's bedroom. When asked if this was the gun used in the robbery of a mail carrier, Hopper looked down and stated, "That's not the gun." Hopper denied knowing Ridley or being affiliated with a gang. Hopper's booking information revealed that he was 6'3" tall and weighed 300 pounds.

Martin testified that when Ridley was first interviewed, he denied being involved in the Schafer robbery, and denied seeing or handling a gun. In a later interview, Ridley admitted being the driver in the Schafer robbery and handling the gun. Ridley told police that Hopper had been injured playing football in high school, a fact which was corroborated at trial by the testimony of Ralph Thompson, the football coach at Maplewood High School.

Lisa Aldridge, Ridley's girlfriend and the mother of his child, testified at trial. Aldridge was the owner of a black Nissan Altima, and the vehicle had temporary tags in February and March of 2008. She resided at 5800 Maudina Avenue, Apartment J6. Aldridge testified that she met Hopper, known to her as "C-Lo," through Ridley and that both Ridley and Hopper were members of the Rollin' 40s Crips gang. Aldridge obtained Schafer's debit/credit card when Hopper came to her apartment with Ridley after the robbery. Hopper was carrying a black revolver in his hand which belonged to Ridley. Ridley announced that they had just robbed a postal worker. Hopper pulled the card from the black hoodie he was

4

wearing and handed it to her, and Ridley told her to see if the card worked. Aldridge used Schafer's debit/credit card at a Kroger and a Citgo gas station without his authorization. Aldridge also obtained Schafer's cell phone from Hopper and used it to make calls.

Aldridge testified that Ridley and Hopper also discussed two other robberies, one in which they got $200 in the robbery of a man at a construction site, and also the robbery of a Mexican man whose necklace they stole, but the medallion fell off the necklace. The gun used in these robberies was the gun used in the robbery of the postal worker, and her black Nissan was used in the two other robberies as well.

Aldridge further testified that when law enforcement officers questioned her about the robberies in March of 2008, they showed her a photo spread that included a photo of Hopper, but she lied and denied that she recognized anyone. Aldridge stated that she lied because another gang member, Chris Grissom, was present in her apartment at the time and she was afraid for the safety of herself and her children. She also admitted that during initial questioning, she tried to protect Ridley and was not honest about Ridley's ownership of the gun. However, she later informed the investigators about the gun. Pursuant to a plea agreement, Aldridge pleaded guilty to the offenses of conspiracy to commit identification fraud, wire fraud, identification fraud and aggravated identity theft stemming from her use of Schafer's credit card.

Ridley testified that he and Hopper, known to him as "C-Lo," committed multiple armed robberies beginning in February of 2008,

and that they were members of the Rollin'40s Crips street gang. Ridley testified that he and Hopper would ride around in Aldridge's black Nissan Altima, which had temporary tags, looking for people to rob. Ridley testified that both he and Hopper robbed a man working at the Bellevue apartment complex. They pointed a gun at the man and took his wallet and cell phone. They also took the man's necklace off his neck. Ridley recalled that they took the medallion off the necklace and the necklace fell to the ground. Ridley also testified about the robbery of a man working on a house on Kentucky. Ridley waited in the car while Hopper left the vehicle and robbed the man at gunpoint. That same day, Ridley drove the Nissan to a location where Hopper left the car carrying the gun and robbed a Mexican man, taking $3.00. Ridley and Hopper equally split the proceeds from the robberies.

Ridley also testified concerning the Schafer robbery. He stated that he drove to the mailman's location and observed the mailman's truck. Hopper, dressed in a black hoodie and carrying the firearm, exited the black Nissan Altima and robbed the mailman. Ridley was wearing a sky blue hoodie, that being a gang color for the Rollin' 40s Crips. Hopper took the mailman's wallet, which contained cash and credit cards, and his cell phone. After the robbery, Ridley and Hopper returned to Ridley's apartment, where Ridley gave a credit card to Aldridge and told her to take it to Kroger to see if it would work.

Ridley admitted that he initially lied by telling police that "C-Lo" was not in the photo spread that was shown to him because he didn't want "C-Lo" to get caught, but after Ridley was arrested, he picked Hopper's photograph out of an array. Ridley's gun, a .357

6

Magnum revolver, was used in the robberies. After he came under investigation by the police, Ridley sold the gun in March of 2008 with the assistance of Chris Grissom, another member of the Rowlin' 40s Crips gang, and Percy Eugene Waters, who found a buyer for the gun. Grissom hid Ridley's gun for a week at his mother's house before Ridley sold the gun. Ridley told Grissom that the gun had been used in a robbery, and Grissom heard Ridley and Hopper discussing the mailman robbery. Ridley testified that, pursuant to a plea agreement, he pleaded guilty to all eight counts of the indictment with which he was charged. The government agreed not to request an upward departure if Ridley cooperated.

The government presented other evidence of the uncharged robberies. Ancieto Lara testified that he was robbed at gunpoint on February 22, 2008, at approximately 10:00 a.m., while working at an apartment complex at the Lakes of Bellevue in Nashville, Tennessee. He was approached by two men wearing dark hooded sweatshirts. One of the men was big and tall, around 6'4", and the other was shorter and thinner. The men asked about an apartment number that did not exist, then pulled a black revolver and demanded Lara's wallet. One of the robbers also pulled Lara's necklace off his neck, but the pendant or medallion fell to the ground. The robbers then drove away in what appeared to be a green Saturn. Lara's credit card was used for gasoline purchases. At trial, Lara identified Hopper as being one of the robbers.

Michael Wood, Lara's co-worker, testified that he was walking to the other side of the building when he observed two men approaching Lara. One of the men was wearing a hoodie. When he

7

returned, Lara told him that he had been robbed. Wood helped Lara find the medallion that had fallen off his necklace.

On February 25, 2008, at approximately 10:30 a.m., Jeffrey Horner and Billie Inman were painting a house on Kentucky Avenue in The Nations area when a man came up behind Horner and asked for a cigarette. Horner testified that he told the man that he did not smoke, at which point the person stated, "Come on up out of that pocket with that wallet." Horner turned and saw the man pointing a gun at him. The robber took his cell phone, then patted his back pocket and took his wallet, which contained about $200, while jamming the gun into Horner's stomach. The robber fled and got into the passenger side of a black Altima with temporary tags and tinted windows. When interviewed by the police, Horner described the robber as a very large man wearing a black hoodie with the hood over his head and black pants. At trial, Horner identified Hopper as the person who robbed him. Inman, who witnessed the robbery, described the robber as being 6'3" or 6'4" and close to 300 pounds. Although Inman was unable to identify anyone in a photo spread shown to him by police after the robbery, he identified Hopper at trial as being the person who robbed Horner.

At approximately 10:45 a.m. on February 25, 2008, Juan Mendez was robbed while working at the Village West Apartments on Tennessee Avenue in Nashville. Mendez testified that he was throwing garbage away when a man wearing dark clothing and carrying a gun approached him and demanded his money. Mendez gave him $3.00. After the robber patted Mendez down and learned that he did not have a wallet, the robber was picked up by a black car, which then left the scene. Mendez described the robber as an African-

8

American wearing a dark shirt and pants with a green jacket. The robber was a little taller and heavier than Mendez, who was 5'11" and 225 pounds.

At the close of the government's case, Hopper moved for a judgment of acquittal. The motion was denied by the district court. The jury found Hopper guilty on all counts. In preparing the presentence investigation report, the probation officer grouped Counts One and Two and applied the Guidelines for assault found in U.S.S.G. § 2A2.2. The probation officer also applied the victim-related adjustment for official victim and increased the base offense level by six levels pursuant to U.S.S.G. § 3A1.2(b). Hopper objected to the application of this enhancement, and the district court denied that objection. Hopper was sentenced to a term of incarceration of forty-one months on Counts One and Two to run concurrently, and a consecutive term of eighty-four months on Count Three.

## II.

Hopper raises as error the admission of evidence of other robberies committed by Hopper and Ridley during the week prior to the offenses charged in the indictment. The government argued unsuccessfully below, and now contends on appeal, that this evidence was admissible as background information relevant to the conspiracy between Hopper and Ridley. We need not address this issue, because we find that the district court properly admitted evidence of the uncharged robberies pursuant to Rule 404(b).

Under Rule 404(b), "evidence is not admissible to prove the character of a person in order to show action in conformity

9

therewith" but such evidence may be admissible for other purposes. Rule 404(b). In this case, the district court admitted the evidence as bearing on Hopper's identity as the robber, his intent, and proof of the existence of a plan.

There is a three-step process for the admission of Rule 404(b) evidence. The district court must: (1) make the preliminary determination regarding whether there is sufficient evidence that the other acts took place; (2) determine whether the other acts are admissible for a proper purpose; and (3) determine whether the other acts evidence is more prejudicial than probative. United States v. Lattner, 385 F.3d 947, 955 (6th Cir. 2004). Once the court determines that the evidence is admissible, the court must instruct the jury concerning the factors supporting admissibility, explain why the factor is material, and caution the jurors against using the evidence for an improper purpose. United States v. Bell, 516 F.3d 432, 441 (6th Cir. 2008). In reviewing the admission of evidence under Rule 404(b), this court reviews for clear error the district court's determination that the other act took place, reviews de novo the district court's legal determination that the evidence was admissible for a proper purpose, and reviews for abuse of discretion the determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect. Id. at 440.

As to the first step, the government is not required to demonstrate that the other acts occurred by a preponderance of the evidence, but rather must present some substantiation that they occurred. Huddleston v. United States, 485 U.S. 681, 689 (1988). Rule 404(b) evidence is relevant only if the jury can reasonably

conclude that the act occurred and that the defendant was the actor.  Id.  The record in the instant case reveals that the government presented sufficient evidence that the previous robberies of Lara, Horner and Mendez did in fact occur and that they were committed by Ridley and Hopper, thus satisfying the first branch of the test.

In regard to the second branch, evidence of other acts is probative of a material issue other than character if the evidence is offered for an admissible purpose, the purpose for which the evidence is offered is material or "in issue" and the evidence is probative with regard to the purpose for which it is offered.  United States v. Rayborn, 495 F.3d 328, 342 (6th Cir. 2007).  The "government's purpose in introducing the evidence must be to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove."  United States v. Merriweather, 78 F.3d 1070, 1076 (6th Cir. 1996).

In this case, the government was required to prove that Hopper was the person who committed the indicted offenses.  Hopper denied that he was involved in the offenses charged in the indictment or in the other robberies, thus putting his identity at issue.  Schafer was unable to identify Hopper as the robber because the robber's head was covered with a bandanna.  Where the identity of the perpetrator of the crime charged is at issue, evidence that the defendant committed other acts utilizing the same modus operandi is admissible as tending to prove that the defendant committed the crime charged.  United States v. Johnson, 27 F.3d 1186, 1194 (6th Cir. 1994).  The theory is that if the method of operation employed

11

in all of the crimes is essentially identical and sufficiently unique, the method can be said to be the "signature" of the defendant, thus tending to prove his identity as the perpetrator of the crime.  Id.  In this case, all of the victims testified that the robber came up behind them around mid-day while they were involved in their tasks.  Two robbers were involved in the first robbery, while one robber was involved in the other robberies and fled in a vehicle, more specifically described by two of the victims as a black Nissan with tinted windows and no tags or temporary tags.  All the victims testified that the robber was a large man over six feet tall, wearing black clothing.  In each case, the robber carried a gun.  Two of the victims, Lara and Horner, identified Hopper at trial as being the robber.  Although there were some differences between the robberies and none of the other victims were federal employees, it is not necessary that the crimes be identical in every detail to be admissible under this theory.  United States v. Perry, 438 F.3d 642, 648 (6th Cir. 2006).  The circumstances of the uncharged robberies were sufficiently unique and sufficiently similar to the Schafer robbery to be relevant and probative of the robber's identity.

Hopper's intent was also at issue.  Other act evidence is admissible if specific intent is a statutory element of the offense.  Conspiracy is a specific intent crime because the government must prove that the defendant had the specific intent to further the common unlawful objective of the conspiracy.  Merriweather, 78 F.3d at 1078.  An intent to assault, impede, intimidate or interfere is an element of the § 111(a) charge.  See United States v. Feola, 420 U.S. 671, 684 (1975).  To prove the §

12

924(c) charge, the government was required to prove that Hopper knowingly used and carried a firearm during the commission of the offenses, the term "knowingly" being defined in this context as "voluntarily and intentionally[.]" See Sixth Circuit Pattern Jury Instructions § 12.01 (citing United States v. Odom, 13 F.3d 949, 961 (6th Cir. 1994)(defining "knowingly" in the context of an 18 U.S.C. § 922(g)(1)) firearms offense)).

The district court also admitted the evidence for the purpose of showing the existence of a plan. To prove the conspiracy offense in Count One, the government was required to prove the existence of a common plan or objective. See United States v. Damra, 621 F.3d 474, 498 (6th Cir. 2010)(describing a conspiracy under 18 U.S.C. § 371). In Counts Two and Three of the indictment, Ridley and Hopper were charged both as principals under §§ 111(a) and 924(c)(1)(A)(ii) and under 18 U.S.C. § 2 as aiders and abettors. Aiding and abetting requires that a defendant "in some sort associate himself with the venture, that he participates in it as something he wishes to bring about, and that he seek by his action to make it succeed." United States v. Davis, 306 F.3d 398, 409 (6th Cir. 2002). Thus, the evidence of the other robberies was relevant to show that Hopper and Ridley had a common plan or goal to commit the offenses alleged in the indictment.

Hopper argues that the prejudicial impact of this evidence outweighs its probative value. The district court's decision in this balancing process "is afforded great deference" and the evidence is viewed in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect. Bell, 516 F.3d at 445. Hopper argues that his knowledge

13

or intent to commit the offenses alleged in the indictment could be proved by other means, namely, through the testimony of Aldridge and Ridley. However, his attorney strenuously argued to the jury that Aldridge and Ridley were not credible witnesses. The government contends that the other act evidence is therefore relevant to corroborate the testimony of Ridley and Aldridge concerning the existence of the conspiracy between Hopper and Ridley. Hopper notes that the credibility of witnesses is at issue in every case, and that the credibility of these witnesses could have been bolstered in other ways. However, Hopper does not specify what those other means are. In concluding that the probative value of the evidence outweighed its prejudicial effect, the district court commented that although "404(b) is not geared to answer challenges to credibility[,] ... those challenges relate to the issues of identity, as to who actually was in charge of the gun, who used the gun in this case, and whether or not Mr. Hopper had the requisite intent for a conviction in this case by showing his involvement in similar robberies." Since Hopper challenged the testimony of Ridley and Aldridge which bore upon the issues of identity, intent and plan, this made the other act evidence which was probative of those same issues all the more relevant.

The potential prejudicial effect of this evidence was also significantly mitigated by the fact that the district court twice instructed the jury on the manner in which this evidence could be considered. Before evidence of the uncharged robberies was presented, the court instructed the jury as follows:

> You are about to hear evidence of some other robberies other than those charged in this indictment. You are not to consider that evidence of those past robberies to determine the character of the defendant or to determine

14

whether or not he acted in the present case before you in accordance with any character or character traits that may be implicated by other robberies that people say he was involved in.

If you find that the defendant did commit other robberies or if you find that he aided and abetted someone else in committing the armed robberies, you cannot consider this evidence as proof that he committed the offense before you now, the mailman robbery.

Instead, you can consider this evidence only for certain limited purposes, such as to show the defendant's identity as the person who committed the crimes charged in the indictment before you; or to show the defendant's intent to commit the crimes charged in the present indictment; or, if relevant, to show that the defendant had a plan or planned to commit crimes, including the one charged in the indictment.

So you may not consider this evidence for any other purpose except for those limited purposes that I have put before you.

Vol. 3 at 340-341. At the conclusion of the trial, the court charged the jury as follows:

You've heard testimony that the defendant and Tony Ridley committed armed robbery of individuals other than the armed robbery of Eric Schafer that is at issue in the offenses charged in this indictment.

If you find the defendant committed other armed robberies or if you find the defendant aided and abetted Tony Ridley in committing other armed robberies, you cannot consider such evidence as proof of the defendant's character or that the defendant committed the offenses for which he is now on trial.

Instead, you can consider the evidence only for certain limited purposes as explained to you earlier, such as the following: (1) To show the defendant's identity as the person who committed the crimes charged in the indictment; (2) To show the defendant's intent to commit the crimes charged in the indictment; and (3) To show the defendant planned to commit the crimes charged in the indictment. You may not consider the evidence for any other purpose than for the limited purposes just stated.

15

Vol. 4A at 36-37. These instructions were adequate to minimize any risk of prejudice to Hopper.

Finally, any error in the admission of Rule 404(b) evidence is subject to a harmless error analysis. "An error in the admission of evidence does not require granting a criminal defendant a new trial unless the error affects 'substantial rights.'" United States v. DeSantis, 134 F.3d 760, 769 (6th Cir. 1998)(quoting Fed. R. Crim. P. 52(a)). When the government presents other convincing evidence, the admission of improper Rule 404(b) evidence may be harmless error. Bell, 516 F.3d at 447. Here, the government also presented testimony from Ridley, a co-conspirator, and Aldridge concerning Hopper's participation in the offenses charged in the indictment. See United States v. Clark, 634 F.3d 874, 878 (6th Cir. 2011)(concluding that any error in the admission of Rule 404(b) evidence was harmless in light of the extensive testimony from two co-defendants about defendant's involvement in the string of robberies). Even assuming that the evidence of uncharged robberies should not have been allowed under Rule 404(b), any error in the admission of that evidence was harmless.

## III.

Hopper argues that the trial court erred in denying his motion for judgment of acquittal. This court reviews de novo the denial of a motion for judgment of acquittal, viewing the evidence in "a light most favorable to the prosecution, giving the prosecution the benefit of all reasonable inferences from the testimony." United States v. McAuliffe, 490 F.3d 526, 537 (6th Cir. 2007). "The relevant question in assessing a challenge to the sufficiency of

16

the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also Jackson v. Virginia, 443 U.S. 307, 319 (1979). "A defendant claiming insufficiency of the evidence bears a very heavy burden." United States v. Graham, 622 F.3d 445, 448 (6th Cir. 2010)(citations omitted). This court affords the same weight to both circumstantial and direct evidence, and does not weigh the evidence presented, consider the credibility of witnesses, or substitute its judgment for that of the jury. Id.

Count Two charged Hopper with an offense under § 111(a). That section provides in relevant part that any person who "forcibly assaults, ... impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in ... the performance of official duties" shall be subject to a term of imprisonment, which is enhanced if the defendant acted with the intent to commit another felony, in this case, aggravated robbery, and further enhanced under § 111(b) by the use of a deadly or dangerous weapon during the commission of the offense. § 111(a) and (b). Section 1114 refers to "any officer or employee of the United States or of any agency in any branch of the United States Government[.]" 18 U.S.C. § 1114. The term "agency" includes any "independent establishment" of the United States. 18 U.S.C. § 6. The United States Postal Service is an "independent establishment" of the United States. 39 U.S.C. § 201.

It is well established that § 111(a) does not require proof of knowledge on the part of the offender that the victim of the assault is a federal officer. See Feola, 420 U.S. at 684; United States v. Farrow, 198 F.3d 179, 186 (6th Cir. 1999). The Supreme

17

Court noted in Feola that the fulfillment of the congressional goal to protect federal officers requires "the highest possible degree of certainty that those who killed or assaulted federal officers were brought to justice." 420 U.S. at 684. The Court further stated that "in order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer." Id.

Hopper argues that the offense had nothing to do with the mail, as no mail was stolen, and that he and Ridley were just riding around looking for people to rob, regardless of their employment. Hopper contends that there is no evidence that the victim was chosen because of his status as a federal employee. However, there is no language of § 111 which requires a specific intent on the part the offender to target a federal employee. Since the Supreme Court in Feola stated that the offender does not have to know that his victim is a federal officer, no such requirement can reasonably be read into the statute. See Farrow, 198 F.3d at 187 n.8 (noting, without deciding the issue, that other courts have held that under § 111(a), the government is not required to show a specific intent to injure a federal officer, but only the knowing commission of the acts constituting the offense). Even if we were to accept Hopper's interpretation of the statute, there is evidence that Hopper knew that Schafer was a federal officer or employee because Schafer was wearing his mail carrier

18

uniform, using his marked Postal Service vehicle, and delivering the mail at the time of the robbery. Thus, the jury could reasonably have found that Hopper acted with the intent to injure a federal officer.

As to Hopper's argument that there is no evidence that he specifically intended to impede or interfere with the delivery of the mail, the language of § 111(a) does not require such an intent. That section prohibits impeding or interfering with a government employee "while [the government employee was] engaged in ... the performance of official duties[.]" § 111(a) (emphasis supplied). This language does not require that the offender's acts be specifically motivated by an intent to impede or interfere with the victim's official duties; rather, the offender's acts must simply have the effect of impeding or interfering with the government employee at a time when he is performing his official duties. Likewise, the statute requires that the assault or intimidation of a federal employee must occur "while" the employee is engaged in the performance of his official duties, but says nothing about the assault or intimidation having to be motivated by the fact that the employee is a government employee or because he is engaged in the performance of his official duties.

Thus, to establish an offense under § 111(a), the government is only required to prove that the defendant acted knowingly and intentionally in committing acts that constituted assaulting, impeding, intimidating, or interfering with a person, and that the person was in fact a federal employee who was engaged in his or her official duties at the time of the offense. The evidence presented was sufficient for the jury to find that Hopper knowingly and

19

intentionally held a gun to Schafer's head and robbed him, and that in doing so, he assaulted and intimidated Schafer, a federal employee, at a time when he was engaged in his official duties. There was also evidence that the robbery impeded and interfered with Schafer while he was engaged in his official duties because his delivery of the mail was delayed at least an hour while he reported the robbery to the police.

Hopper also argues that the evidence is insufficient to support the conspiracy charge in Count One. Section 372 provides in relevant part that it is an offense for two or more persons to conspire to "injure [an officer of the United States] in his person or property ... while engaged in the lawful discharge [of the duties of his office]." To establish a conspiracy, the government must prove that (1) the conspiracy described in the indictment was wilfully formed and existed at or about the time alleged; (2) the accused wilfully became a member of the conspiracy; (3) one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time alleged; and (4) that overt act was knowingly done in furtherance of the conspiracy's object. Damra, 621 F.3d at 498 (describing a conspiracy under 18 U.S.C. § 371). "The existence of a criminal conspiracy need not be proven by direct evidence, a common plan may be inferred from circumstantial evidence." United States v. Branham, 97 F.3d 835, 854 (6th Cir. 1996). A defendant need only know of the conspiracy, associate himself with it, and knowingly contribute his efforts in its furtherance, and every member of a conspiracy need not be an active participant in every phase of the

20

conspiracy.  United States v. Beverly, 369 F.3d 516, 532 (6th Cir. 2004).

Hopper argues that the government was required to prove that the object of the conspiracy was specifically to rob a federal officer.  He contends that since all of the other victims robbed during the course of the conspiracy were not federal employees and no mail was stolen during the robbery of Schafer, the government failed to prove that he conspired with Ridley to injure, specifically, a federal employee in his person or property while he was engaged in his official duties.  The clause of § 372 which is the subject of Count One of the indictment simply requires an intent to injure an individual in his person or property, that the individual is an officer of the United States, and that the injury is planned to occur while the individual is engaged in the lawful discharge of his duties.  It says nothing about having a specific purpose to impede or interfere with those official duties.  The statute also says "his person or property," not government property such as the mail.  § 372 (emphasis supplied).

The reasoning of the Supreme Court in Feola is applicable here, although that case involved a charge of conspiracy to violate § 111(a).  The Supreme Court held that a conspiracy to violate § 111(a) did not require an agreement to assault a federal officer specifically or knowledge on the part of the conspirators that the person to be assaulted was a federal employee.  420 U.S. at 694-96. The Court stated:

> If the agreement calls for an attack on an individual specifically identified, either by name or by some unique characteristic, as the putative buyers in the present case, and that specifically identified individual is in fact a federal officer, the agreement may be fairly characterized as one calling for an assault upon a

21

federal officer, even though the parties were unaware of the victim's actual identity and even though they would not have agreed to the assault had they known that identity.

The policy reasons for not requiring a specific purpose to assault a federal employee in the prosecution of a conspiracy under § 111(a) also apply to a conspiracy to injure a federal employee in his person or property while he is engaged in his official duties.

Even if § 372 requires proof that the purpose of the conspiracy was to injure a federal employee specifically, the evidence showed that Ridley and Hopper observed Schafer, who was dressed in his mail carrier uniform and using a marked mail truck, as they were driving around looking for a victim to rob. Thus, the two conspirators knew that Schafer was a government employee engaged in his official duties before Hopper left the car to rob him. The jury could reasonably conclude from the evidence that Ridley and Hopper agreed to rob, specifically, a federal officer engaged in his official duties.

Hopper argues that since his conviction on the firearm charge in Count Three was based on the commission of the § 111(a) charge alleged in Count Two, his conviction on the firearm count must also be reversed if the court finds that Count Two is not supported by sufficient evidence. Since we have concluded that his conviction on Count Two is supported by sufficient evidence, this argument fails.

IV.

In his third assignment of error, Hopper asserts that the district court erred in denying his motion for a mistrial based on a comment made by the prosecutor during closing argument concerning

22

his being dressed in gang colors during jury selection. During trial, there was testimony that Hopper and Ridley knew each other as members of the Rollin' 40s Crips gang, and that the gang's color was sky blue. During rebuttal argument, the prosecutor stated:

> How many times did defense counsel refer to that man as a "kid"? Five? Ten? You know, the defendant is a Rollin' 40 Crips gang member. He flew the flag in here during jury selection. Remember that sky blue stuff that he was wearing. He was flying the flag on Tuesday."

Vol. 4B at 25-26. Defense counsel objected to this comment on the ground that it was "inappropriate," and the court stated, "All right. Stick to the facts of the case." Vol. 4B at 26. Later, while the jury was deliberating, and during a conference with counsel to discuss questions which had been submitted by the jury, defense counsel moved for a mistrial, not because of the reference to Hopper's gang membership, which was disclosed by the testimony in the case, but rather because there was no evidence that Hopper had selected those clothes. Counsel indicated that Hopper's mother had brought the clothes for Hopper to wear instead of his jail garb. The government argued that the comment was for the purpose of reminding the jury that Hopper was an adult gang member in response to defense counsel's efforts to elicit sympathy from the jury on Hopper's behalf by repeatedly calling him a "kid."

The district court found that both the prosecutor's comment and defense counsel's reference to Hopper as being a "kid" were improper. The court further noted that there was evidence concerning Hopper's membership in the gang and the gang color, and concluded that the comment did not warrant granting a mistrial. Defense counsel asked for a curative instruction, and there was some discussion about counsel submitting a proposed instruction to

23

the court. Since the jury had forwarded a question to the court during deliberations concerning Hopper's gang membership, counsel for the government suggested that the court include a statement about the government's comment concerning clothing in the court's response, and defense counsel agreed with that approach. However, the court's written note to the jury is not in the record.

This court reviews the denial of a motion for a mistrial based on prosecutorial misconduct for abuse of discretion. United States v. Wettstain, 618 F.3d 577, 588 (6th Cir. 2010). The "relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). The first step of the analysis is to determine: (1) whether the prosecutor's remarks were improper; and, if so, (2) whether they were flagrant. Wettstain, 618 F.3d at 589. Improper remarks that are flagrant amount to per se reversible error, while improper remarks that are not flagrant may or may not be reversible. United States v. Hargrove, 416 F.3d 486, 493 (6th Cir. 2005).

To determine whether the remarks were flagrant, the court looks at: (1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or extensive; (3) whether the statements were deliberately placed before the jury; and (4) the overall strength of the evidence against the defendant. United States v. Gonzalez, 512 F.3d 285, 292 (6th Cir. 2008). This court reverses for improper non-flagrant prosecutorial misconduct only where: (1) the proof against the defendant was not overwhelming; (2) defense counsel objected to the conduct; and (3) the district court failed to give a curative

24

instruction. <u>United States v. Brown</u>, 66 F.3d 124, 127 (6th Cir. 1995).

The prosecutor's remark in this case was technically improper because there was no evidence that Hopper actually picked what to wear during jury selection. However, the prosecutor's remarks must be considered within the context of the trial as a whole. <u>United States v. Wells</u>, 623 F.3d 332, 338 (6th Cir. 2010). There was evidence, which came in without objection, that Hopper was a gang member and that sky blue was the gang color. The reference to Hopper wearing gang colors did not inject his gang membership into the trial for the first time, and therefore any prejudice to Hopper would have been minimal or nonexistent. <u>See</u> <u>Ho Thai Nguyen v. Terhune</u>, 192 F.App'x 603, 604-05 (9th Cir. 2006)(finding that prosecutor's suggestion that shooting was gang-related because victim was wearing gang color did not deny petitioner a fair trial where there was evidence of petitioner's gang membership and the clothing color of rival gang). Although defense counsel stated that Hopper's mother brought his clothes, the defense did not deny that the blue gang color clothes Hopper was wearing were his clothes. Although the statement was deliberate, it was isolated. Inappropriate but isolated prosecutorial comments do not warrant a new trial. <u>Wells</u>, 623 F.3d at 338. In more egregious cases, courts have found that prosecutorial comments concerning defendant's gang membership during closing argument did not deprive the defendant of a fair trial. <u>See</u> <u>United States v. Rodgers</u>, 51 F.3d 1044 (table), 1995 WL 153134 at *8-10 (5th Cir. March 23, 1995)(repeated improper references to gangs was harmless error); <u>United States ex rel. Garcia v. Lane</u>, 698 F.2d 900, 901-902 (7th

25

Cir. 1983)(repeated references to petitioner's gang membership did not deny defendant a fair trial).

The evidence against Hopper was otherwise strong, since Ridley and Aldridge testified concerning Hopper's involvement in the offenses. Hopper's identity as the robber was also supported by the other act evidence. Defense counsel objected and the court in essence sustained the objection, stating, "All right. Stick to the facts of the case." Vol. 4B at 26. The court instructed the jury at the beginning of the case and during the final charge that the statements of counsel are not evidence. It was not until after the jury retired to deliberate that defense counsel moved for a mistrial and requested a curative instruction, thereby depriving the trial court of the opportunity to address the matter during closing argument. The district court agreed to give a curative instruction as part of his written answer to the jury questions, and the court may have done so, although that instruction is not in the record. The district court did not abuse its discretion in denying the motion for a mistrial.

V.

Hopper's final assignment of error concerns the district court's application of the official victim enhancement in calculating his offence level under the advisory Guidelines. U.S.S.G. § 3A1.2(a) directs that if the victim was a government employee and the "offense of conviction was motivated by such status," the base offense level is increased by three levels. Under U.S.S.G. § 3A1.2(b), if the factors described in subsection (a) are satisfied and if the applicable Chapter Two guideline is

26

from Chapter Two, Part A (Offenses Against the Person), then the base offense level is increased by six levels. In this case, the base offense level was increased by six levels because the probation officer applied the guideline for aggravated assault in U.S.S.G. § 2A2.2.

The district court's factual findings concerning whether the prerequisites for the enhancement have been met are reviewed for clear error. See Farrow, 198 F.3d at 196. Legal conclusions regarding the Guidelines are reviewed de novo. United States v. Talley, 164 F.3d 989, 1003 (6th Cir. 1999).

Hopper argues that the § 3A1.2(a) enhancement does not apply in this case. Hopper cites United States v. Cherry, 10 F.3d 1003 (3rd Cir. 1993) and United States v. Klump, 21 F.3d 1117 (Table, 1994 WL 143943 (9th Cir. April 22, 1994). Those cases hold that the enhancement does not apply where there was no individual victim involved in the offense of conviction. That is not the case here, where Schafer was an individual victim of the § 111 offense.

Hopper argues there was no evidence that the robbery was motivated by Schafer's status as a government employee, noting Ridley's testimony that the two men were just riding around looking for people to rob, and also noting the fact that no mail was stolen. The government argued below that Hopper knew that Schafer was a mail carrier and, as such, was probably a more lucrative victim, as well as a more vulnerable victim because he was engaged in his duties at the time of the robbery (preoccupied with putting mail in the boxes with his back to Hopper, thereby allowing Hopper to sneak up behind him). In denying Hopper's objection, the district court stated:

27

The instructions also address motivation, that the offense of conviction was motivated by the fact that the victim was a government officer or employee.

But to be motivated by one's official status does not require that the victim's status be the only or the sole reason or even the primary reason for the assault. The fact that the ... defendant knew that the victim was a government official at the time of the offense, in this case the robbery, may be sufficient for finding that he was motivated by his official status.

It is, I think, uncontested that Mr. Hopper and Mr. Ridley, the driver, were driving around looking for somebody to rob and they saw this postal officer. They saw his truck, which was plainly marked United States Postal Service. The letter carrier victim, Mr. Schafer, was standing beside the truck, in his postal uniform.

He had a box of mail that he was distributing in an apartment-multi-tenant apartment mailbox, facing the mailbox as he was placing the mail in the various compartments for the apartments, when Mr. Hopper, driven by Mr. Ridley, drove up. Mr. Hopper came out, drew his pistol, came up behind him, and robbed him.

So under the facts of the trial, there was no question that he knew at that time that he was robbing this postal letter carrier who was involved in his official duties. And the Court finds that that was sufficient motivation to meet the requirement under the statute.... And the Court believes that that may not have been his sole or only reason for robbing Mr. Schafer. They were looking for money. But the fact that he knew that he was robbing a United States Postal Inspector has consequences in the victim-related adjustments[.]

Vol. 5 at 636-37.

The district court correctly stated that the official status of the victim need not be the sole or primary motivation for the offense. See United States v. Abbott, 221 F.App'x 186, 189 (4th Cir. 2007). Therefore, the fact that Hopper robbed Schafer to obtain money and other property does not preclude a finding that the robbery was also motivated by Schafer's official status. The

28

district court correctly noted that the fact that Hopper was aware that Schafer was a mail carrier may be sufficient for finding that Hopper was motivated by Schafer's official status. See Farrow, 198 F.3d at 196-98 (discussing defendant's knowledge of the fact that victims of assault were INS agents in upholding application of official victim enhancement); see also United States v. Garcia, 34 F.3d 6, 13 (1st Cir. 1994)(upholding application of enhancement where defendant knew that the officers he attempted to run down with his car were law enforcement officials); United States v. Salim, 287 F.Supp.2d 250, 307 (S.D.N.Y. 2003)(defendant's knowledge that victim was a corrections officer at the time of the attack was sufficient for a finding that defendant was motivated by the officer's official status in attacking him), aff'd 549 F.3d 67 (2d Cir. 2008).

Even assuming that evidence of knowledge of the victim's official status alone is not sufficient to draw an inference of motivation, the district court also made reference to the government's argument that Schafer was facing the mailbox and placing mail in the compartments when Hopper came up behind him. Since Schafer was distracted and preoccupied with his official duties, this made him an easy target. The district court's finding that the offense was motivated by Schafer's official status is supported by the evidence.

Hopper also argues that it is inconsistent for the government to argue that the robbery of Schafer was like the other robberies of persons who were not government employees for the purpose of admitting Rule 404(b) evidence, but then to argue that the robbery of Schafer was motivated by his official status. However, the fact

29

that the robberies were factually similar for purposes of a Rule 404(b) analysis does not mean that Hopper was not motivated at least in part by the fact that Schafer was a mail carrier in choosing him as a victim.

Hopper also argues that the § 3A1.2(a) official victim enhancement should not be applied because that would result in double counting in light of the fact that the probation officer also applied the specific offense characteristic in § 2A2.2(b)(6), which increases the guideline range by two levels where the defendant is convicted under § 111(b) for committing the § 111 offense using a deadly weapon. The guideline notes indicate that this was not impermissible double counting. Application Note 4 to § 2A2.2 states that if "subsection (b)(6) applies, § 3A1.2(a) (Official Victim) also shall apply." U.S.S.G. § 2A2.2, Application Note 4. Application Note 2 to § 3A1.2 states, "Do not apply this adjustment if the offense guideline specifically incorporates this factor. The only offense guideline in Chapter Two that specifically incorporates this factor is § 2A2.4 (Obstructing or Impeding Officers.)" That guideline is not applicable in this case. The application of both the official victim enhancement and the specific offense characteristic did not constitute improper double counting.

In summary, we find no error in the district court's application of the official victim enhancement.

## VI.

For the foregoing reasons, we affirm the judgment and sentence of the district court.

30