**NOT RECOMMENDED FOR PUBLICATION**

File Name: 12a0239n.06

No. 10-6086

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | **FILED** |
| **Plaintiff-Appellee,** | ) | **Feb 29, 2012** |
| | ) | LEONARD GREEN, Clerk |
| **v.** | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| **Michael Smith, aka Michael Walls,** | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |
| | ) | |

BEFORE:  MERRITT and COOK, Circuit Judges; and COX, District Judge.[*]

**MERRITT, Circuit Judge.**  Defendant Michael Smith, also known as Michael Walls, was convicted after a jury trial of assaulting a federal employee while the employee was engaged in the performance of official duties in violation of 18 U.S.C. § 111, and kidnaping a federal employee while the employee was engaged in the performance of official duties in violation of 18 U.S.C. § 1201(a)(5)—arising from the rape and robbery of a postal worker in her mail truck while she was on her route delivering mail in Memphis, Tennessee.  On appeal, Smith claims error by the district court in (1) overruling his motion to suppress evidence; (2) enhancing his offense level at sentencing by six levels pursuant to U.S.S.G. § 3A1.2(b) on the ground that the victim was a government employee and the offense was motivated by her government status; and (3) denying his motion for

---

[*]The Honorable Sean F. Cox, United States District Court for the Eastern District of Michigan, sitting by designation.

a new trial without granting him an evidentiary hearing on the composition of his jury venire, which

Smith claims disproportionately excluded African Americans.

**I.**

At about 12:30 p.m. on November 10, 2005, C.O.,[1] a letter carrier employed by the United

States Postal Service, reported that she had been raped and robbed while delivering mail in

Memphis. She said that a man came up to her postal truck, stuck his arm through the window and

grabbed her by the neck. He held "something hard" against her head and told her he had a gun. He

ordered her into the back of the truck and raped her. After he exited the truck, he immediately

returned and demanded money. C.O. threw her purse to him and he left with the purse. A woman

in the neighborhood had noticed the mail truck stopped for an extended length of time and came out

to the vehicle. C.O. told her she had been raped. The neighbor called the police and C.O. called her

husband and her supervisor.

Police and postal investigators came to the scene. C.O. described her assailant as a black

male between 18 and 23, having a height of 5'7" to 5'9" and weighing about 150 pounds. He wore

blue jeans with white stitching, a hooded sweatshirt and white tennis shoes. He kept the hood up

on the sweatshirt throughout the attack, keeping C.O. from getting a good look at his face.

Investigators began searching the area immediately for the man matching the description

given them by C.O. About two hours after the assault, two postal inspectors driving through a

residential area saw a young man sitting on a curb matching the description C.O. had given them.

---

[1]The government requests that the opinion refer to the victim by her initials.

He had an article of denim clothing draped around his neck. As the inspectors approached in their vehicle the man fled, dropping the item that had been draped around his neck. Although they pursued the man, the inspectors did not catch him. When they returned a short time later to the spot where they first saw him, they found a pair of denim blue jeans. The postal inspectors had also noticed that the man had a very distinctive haircut — a short cut with several twists in the hair.

Later that same day, Memphis police officer Robert Brown arrived on the scene to take part in the investigation because he knew the neighborhood well. After he heard the physical description of the suspect, he told the postal inspectors that he believed that the man they were looking for was one of three men: Michael Walls, Kenny Gross or Kenny's younger brother, Rick-Rick. Officer Brown said that Kenny Gross and Michael Walls looked similar to each other and even shared clothes so they could pretend to be the other one if they got into trouble. The postal inspectors viewed a picture of Kenny Gross on the afternoon of November 10 and a photograph of Walls either on the evening of the 10th or the morning of November 11. They believed that either man could be the man they saw on the curb who ran from them. Investigators also found out on the evening of November 10 or the morning of November 11 that Michael Walls was also known as Michael Smith. Based on the information they had gathered, they began looking for Kenny Gross or Michael Walls/Smith on the morning of November 11.

They found Kenny Gross first. Gross denied being at the location of the assault the day before and said he was at his house with his friend Shawn Williams from noon to 1 p.m. on November 10. Gross told the inspectors that Walls came to Shawn Williams' house while Gross was there on November 10. He was wearing a hooded sweatshirt and blue jeans and carrying a second

pair of blue jeans. He said he wanted to change his clothes; but, because Williams and Gross were leaving, Smith did not have an opportunity at that time to change. All three men left the house shortly thereafter. Gross also told the inspectors that late in the afternoon of November 10, Walls telephoned Shawn Williams while Williams and Gross were riding around in the car. Gross overheard Walls tell Williams that the police were chasing him and that they thought he raped and robbed the mail lady. After being interviewed, Gross gave a signed, written statement and he agreed to give investigators a DNA sample.

During his interview with postal inspectors on the morning of November 11, Kenny Gross agreed to call Walls and try to locate him. Gross made the call and told Postal Inspector Valerie Clay that Walls was at the Red Oak Apartments in front of the home of Brenda Williams, the mother of Shawn Williams. Clay called Postal Inspector Jack Dietz, who was already at the Red Oak Apartments trying to locate Shawn Williams. After being briefed over the phone by Clay, Dietz and another inspector went to Brenda Williams' apartment and found a man in front of her apartment. Dietz asked the man if he was Michael Walls and the man said no. Dietz asked if he knew Kenny Gross or had spoken to him and the man said no. When asked for identification, the man produced ID with the name "Michael Smith." Dietz then called Clay to confirm that this was the man for whom they were looking and, when told that it was, the man was arrested and put in the inspector's car.

Dietz then went to Brenda Williams' apartment and said they were looking for Michael Walls. Ms. Williams responded that he was the man sitting in the car. When told that the man in the car said that his name was Michael Smith, Ms. Williams told Dietz that Michael Walls and

Michael Smith were the same person. Ms. Williams told Dietz that Smith had come to her apartment the day before—November 10, the day of the attack on C.O.—at about 5 p.m. and told her he was running from the police. Ms. Williams said that Smith changed clothes in her apartment and that the clothes out of which he changed were still in the apartment. The inspectors retrieved the clothes and found among them a pair of blue jeans with white stitching matching the description of the jeans C.O. said her assailant wore.

While at Ms. Williams' apartment, Dietz also spoke with Brandi Norman, Brenda Williams' niece, who said she was at the apartment when Smith came by the day before . She told Dietz that she also heard Smith say he was running from the police; and, in addition, Smith told Norman that he was sitting on the curb when he saw a dark blue car with tinted windows approaching. Believing it to be the police, he took off running and dropped the pair of pants he had draped around his neck. Dietz also spoke with Shawn Williams while he was at the apartment, and Shawn Williams corroborated the story that Kenny Gross had told the inspectors about his encounter and phone call with Smith.

Smith was then transported to the postal inspection service office where he was given his *Miranda* rights and interviewed. Smith also gave written consent to giving a DNA sample. Smith's DNA matched the DNA found in the samples taken from C.O. the day of the rape.

A two-count indictment was returned against Smith: Count 1 charged him with forcible assault and infliction of bodily injury on a federal employee while the employee was engaged in the performance of official duties in violation of 18 U.S.C. § 111; and Count 2 charged him with unlawfully seizing, confining and holding for purposes of a sexual assault a federal employee while

the employee was engaged in the performance of official duties in violation of 18 U.S.C. § 1201(a)(5). (R.10)   Smith filed a motion to suppress evidence. (R. 63)  The district court held a hearing and denied the motion on October 8, 2008. (R.85)  The case was tried to a jury and Smith testified that the sex was consensual.  The first trial ended in a hung jury.  The case was retried and defendant raised the same defense of consensual sex, but he was convicted on both counts.  A presentence report was prepared that calculated an offense level of 48 and a criminal history category of IV, resulting in a guideline range of life imprisonment.  The defendant made numerous objections to the presentence report.  After a sentencing hearing, Smith was sentenced to a prison term of 25 years. This appeal followed.

## II.

Defendant raises three issues on appeal:  (1) the district court erred in denying his motion to suppress because Inspector Dietz did not have probable cause to arrest him; (2) the district court erred in adding a six-level enhancement to his base offense level pursuant to U.S.S.G. § 3A1.2 due to the victim's status as a government employee; and (3) the district court erred in refusing to hold an evidentiary hearing based on the alleged racial disparity in the composition of the jury pool.

## A.  Denial of Motion to Suppress

Defendant appeals the denial of his motion to suppress all evidence flowing from his arrest, including statements and DNA evidence taken with his consent.  Defendant contends that he was under arrest when he was placed in the back of the postal inspector's vehicle and that Inspector Dietz lacked probable cause at that moment to arrest or detain him.  We assume that defendant was under arrest when he was handcuffed and placed in the Inspector's vehicle.  *Peete v. Metro. Gov't of*

*Nashville & Davidson Cnty.*, 486 F.3d 217, 220 (6th Cir. 2007) (A seizure occurs where "intentional interference with a person's liberty by physical force or a show of authority . . . would cause a reasonable person consciously to submit.").

When a district court denies a motion to suppress evidence, we review the court's legal conclusions de novo and its findings of fact for clear error. *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). A factual finding is clearly erroneous if our review of the evidence leaves us "with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). We accord "considerable deference" to the district court's credibility findings. *United States v. McCauley,* 548 F.3d 440, 447 (6th Cir. 2008) (quoting *United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990)). Whether probable cause exists turns on whether the "'facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent' person to conclude that an individual either had committed or was committing an offense." *United States v. Torres–Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). In order to determine whether probable cause existed at the time of the arrest, we look to the totality of the circumstances. *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (citations omitted).

We agree with the district court's finding that Inspector Dietz possessed probable cause for an arrest when he handcuffed defendant and put him in the vehicle. Dietz had substantial evidence that a rape had been committed the day before by a man fitting defendant's description. Dietz was told by investigators that he would find the person suspected of the rape in front of Brenda Williams'

apartment, and when he arrived there moments later he encountered defendant outside of Ms. Williams' home. Dietz knew that the suspect had made a statement to Kenny Gross and Shawn Williams on the day of the attack that he was running from the police because he had raped and robbed the "mail lady," a key piece of evidence supporting probable cause here. It is significant that the suspect had made this statement to Gross and Shawn Williams only a few hours after the attack at a time that this fact would have been known to only a few people because no details had been released to the public yet. Law enforcement also believed from information received from Officer Brown and Kenny Gross that the suspect, who fit the description of the man now before Dietz, ran from postal inspectors the day before, dropping a pair of jeans as he fled. The only confusion was that Dietz thought the person he was looking for was named "Michael Walls" and this person had ID indicating his name was "Michael Smith."[2] Despite this confusion, based on everything known to Dietz from his own investigation and what he had been told by other investigators, Dietz had probable cause to arrest defendant at that moment. The evidence held by law enforcement was sufficiently strong to constitute probable cause. Hence, the defendant's consent to giving a DNA sample to police was not vitiated by an illegal arrest.

**B. § 3A1.2 Enhancement for Official Victim**

---

[2]Dietz admitted to being "confused" when he saw the name "Michael Smith" on the identification. Motion to Suppress Hearing Tr. at 138-39, July 24, 2008 (R.78). The district court found that the evidence was not sufficient to support a finding of fact that, prior to handcuffing defendant and placing him in the vehicle, Dietz had actually learned that "Michael Walls" was a name formerly used by defendant. Order Denying Motion to Suppress at 3 n.3 (Oct. 8, 2008) (R.85). We agree with the district court that any confusion over the name does not undermine the conclusion that Dietz had probable cause to arrest defendant at that moment.

In defendant's next assignment of error, he contends that he should not have received a six-level increase in his offense level for the "official victim" enhancement pursuant to U.S.S.G. § 3A1.2.[3] Section 3A1.2(a) provides that a defendant's base offense level should be increased by three levels if the victim was a government officer or employee and the offense of conviction was motivated by the officer's status as a government employee. Section 3A1.2(b) further provides that the defendant's base offense level should be increased by six levels rather than three levels if the "applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." In this case, defendant's base offense level of 32 was increased by six levels because the guideline used, § 2A4.1(a), entitled "Kidnapping, Abduction, Unlawful Restraint," is from Chapter Two, Part A.

Defendant argues that the district court erred in enhancing his base offense level under § 3A1.2(b) because there was no evidence that his attack on C.O. was "motivated" by her status as a government employee. Paradoxically, he asserts that he is less culpable because he would have sexually assaulted any woman who happened to be in the vicinity at that time so there is no nexus between his conduct and C.O.'s position as a postal worker. Defendant also argues that the enhancement allows impermissible doublecounting because the statutes under which he was

---

[3]Section 3A1.2, entitled "Official Victim," provides in relevant part:

(a) If (1) the victim was (A) a government officer or employee; . . . ; and (2) the offense of conviction was motivated by such status, increase by 3 levels.
(b) If subsection(a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by 6 levels.

convicted already take into account the fact that the victim was a government employee. Defendant's Br. at 40.

The doublecounting issue is without merit, as defendant concedes in his brief. Br. at 39-40 ("The courts . . . have rejected double-counting arguments because § 3A1.2 'requires a higher level of culpability, *i.e.,* the defendant's action must have been 'motivated' by the victim's official status.'"). The offense guideline used in defendant's case, § 2A4.1(a), does not account for the victim being a government employee or official, so no doublecounting occurred. *United States v. Talley*, 164 F.3d 989, 1004 (6th Cir. 1999). But, as the government concedes, "the provision of § 3A1.2(a) and (b) [that] prevents double-counting is that the defendant was 'motivated' by [the] governmental status of the victim." Gov't Br. at 21 n.3.

The issue of whether defendant's attack on C.O. was "motivated" by her status as a government employee is not so easily dismissed. The issue was not fleshed out in the district court, and the discussion at the sentencing hearing focused almost exclusively on the doublecounting issue. Ultimately, the district court overruled defendant's objection to the six-level enhancement under § 3A1.2(b), but the record reflects that its decision was based upon the legal issue of whether the guideline allowed for impermissible doublecounting, rather than the factual issue of whether defendant's conduct was motivated by C.O.'s position as a postal worker. The government has provided some rationalization in its brief on appeal by claiming that the fact that C.O. was in her postal truck with a large cargo area in the back is what motivated defendant to attack her. Government's Br. at 32. Defendant argues that the government has not met its burden of proof on this issue.

Since the filing of the briefs in this case, our Court has issued an unpublished opinion that is factually similar to the instant case. In *United States v. Hopper*, 436 F. App'x 414 (6th Cir. 2011), we affirmed the application of the enhancement under § 3A1.2 after Hopper was convicted of armed robbery that occurred while a postal worker was delivering mail. Hopper, while pointing a gun at the mail carrier, demanded money and took the mail carrier's personal cell phone and wallet containing cash and credit cards. Hopper argued that there was no evidence that the robbery was motivated by the mail carrier's status as a government employee and that he and a friend were just joy riding and looking for people to rob. The government argued that Hopper attacked the mail carrier because he was probably a more lucrative victim than those who lived in the neighborhood and because he was more vulnerable at that time because he was preoccupied with delivering the mail and had his back to the street as he put the mail in the boxes at an apartment building. We seem to have used an objective rather than a subjective intent standard: "the official status of the victim need not be the sole reason or primary motivation for the offense. . . . [T]he fact that Hopper was aware that [the victim] was a mail carrier may be sufficient for finding that Hopper was motivated by [the victim's] official status." 436 F. App'x at 429 (citations omitted). The opinion continues:

> Even assuming that evidence of knowledge of the victim's official status alone is not sufficient to draw an inference of motivation, the district court also made reference to the government's argument that [the victim] was facing the mailbox and placing mail in the compartments when Hopper came up behind him. Since [the victim] was distracted and preoccupied with his official duties, this made him an easy target. The district court's finding that the offense was motivated by [the victim's] official status is supported by the evidence.

*Id.*

-11-

The district court in this case did not comment directly on the motivation issue at sentencing. The Sentencing Commission does not make clear whether the word "motivated" in the guideline is intended to establish an objective or subjective standard. But, in this case, any error in defining and applying the enhancement was harmless. Even after subtracting the six-level enhancement added under § 3A1.2(b), defendant's guideline range would have been 360 months to life. The district court imposed a sentence of 25 years—well below the guideline range. *See United States v. Lalonde*, 509 F.3d 750, 765 (6th Cir. 2007) (a sentencing guideline calculation error can be harmless).

## C. <u>Racial Disparity in the Composition of the Jury Pool</u>

Smith filed a motion for a new trial claiming that African Americans were underrepresented in the jury pool for the Western District of Tennessee. The Supreme Court has held that "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community," *Berghuis v. Smith*, 130 S. Ct. 1382, 1387 (2010), but has not held that a defendant is entitled to a jury of any particular racial composition. The fact that there were "only three African Americans jurors initially selected in the venire" is defendant's only factual basis for this claim. In denying the motion, the district court relied on *Duren v. Missouri*, 439 U.S. 357, 364 (1979), which holds that a defendant asserting a Sixth Amendment violation in the composition of the jury pool must demonstrate that (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group is not fair and reasonable; and (3) the underrepresentation was due to a systematic exclusion of the group in the selection process. Order Denying Defendant's Motion for a New Trial at 3 (filed Mar. 15, 2010). (R.142) The district court found that defendant had not met the standard set forth in *Duren* because

he presented no evidence of "systematic exclusion" of African Americans. *Id*. at 4-5. *Duren* described "systematic exclusion" to mean exclusion "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 365-66. The proof must be sufficient to support an inference that a particular process results in underrepresentation of a distinctive group. No such inference is permissible if a federal jury venire reflects the demographics of an entire multi-county federal district but not the demographics of a particular county in which the crime is committed. Defendant points to nothing in the selection process that allows an inference that any underrepresentation was due to the system itself. Merely because the percentage of a distinctive group selected in a single venire does not mirror the percentage of the group in the entire community cannot be construed as systematic exclusion. *See United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (must show more than that a particular panel was unrepresentative of the community); *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir. 1988). The district court did not abuse its discretion in denying defendant's motion for a new trial without first holding an evidentiary hearing because the defendant provided no evidence of systematic exclusion of African Americans from the jury venire.

For the foregoing reasons, we affirm the conviction and sentence of the district court.