*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          *v.*                                          Nos. 11-5904/6223

KENNETH KENNEDY (11-5904) and ANN
SCARBOROUGH (11-6223),
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:07-cr-263—William J. Haynes, Jr., District Judge.

Argued: April 23, 2013

Decided and Filed:  May 10, 2013

Before:  GILMAN, ROGERS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Paul J. Bruno, Nashville, Tennessee, for Appellant in 11-5904.  Rayburn McGowan, Jr., Nashville, Tennessee, for Appellant in 11-6223. Cecil W. VanDevender, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee **ON BRIEF:** Paul J. Bruno, Nashville, Tennessee, for Appellant in 11-5904.  Rayburn McGowan, Jr., Nashville, Tennessee, for Appellant in 11-6223.  Sandra G. Moses, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  This is an appeal of the convictions and sentences received by two participants in a multi-year scheme that defrauded dozens of victims of over $3 million.  Codefendants Kenneth Kennedy (K. Kennedy) and Ann Scarborough were the husband and close friend, respectively, of the scheme's principal

1

participant, Sheila Kennedy (S. Kennedy). The fraud consisted of soliciting money to invest in S. Kennedy's alleged real estate deals and in her proceedings to obtain an inheritance purportedly worth hundreds of millions of dollars, each with the promise of a lucrative return. But the real estate deals and the large inheritance, like the promised returns, proved fictitious.

After a two-week trial, both K. Kennedy and Scarborough were convicted by a jury on multiple counts of mail and wire fraud, and Scarborough was convicted on a separate money-laundering count. The district court subsequently sentenced K. Kennedy to 100 months of imprisonment and ordered him to pay more than $3 million in restitution, and Scarborough was sentenced to 72 months of imprisonment and ordered to pay more than $2.6 million in restitution. Both K. Kennedy and Scarborough argue on appeal that (1) the government's evidence was insufficient to sustain their convictions, (2) the district court erred in denying K. Kennedy's post-trial motions to inspect a jury note and conduct jury interviews, and (3) the district court erroneously applied various sentencing enhancements under the U.S. Sentencing Guidelines. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.    Factual background

S. Kennedy and Scarborough first met in the early 1990s in the small art shop that Scarborough operated in Hopkinsville, Kentucky. The two formed a company called "ASK, LLC" in January 2005. Scarborough soon thereafter opened two checking accounts in the company's name, giving both herself and S. Kennedy signatory authority. S. Kennedy already had her own business entity at that point, called "SEK, LLC," which Scarborough understood was involved in real estate investments.

Their joint scheme to obtain money on the pretense of making real estate investments appears to have begun in 2005. Although the details varied, the pair's solicitations for money would follow a basic theme. The government's brief captures the essence of that theme: "S. Kennedy was a real-estate developer who, through her

connections, could learn of well-heeled companies that wanted to develop properties. Thereafter, S. Kennedy would purchase land, and then re-sell it to the company for several times the purchase price." But Scarborough admitted that these purported real-estate deals never existed. She had seen only one piece of land on which S. Kennedy once possessed an "option," and even that option Scarborough knew had previously lapsed. Scarborough further admitted to an investigating government agent that she was the one who came up with the idea of soliciting money based on a "land option," but claimed that the idea of promising investors a $25,000 return on a $5,000 investment was S. Kennedy's.

Using short-term promissory notes with substantial interest rates, Scarborough convinced many of her friends and associates to invest in these fictitious real estate deals. Most of the solicitations occurred in 2005 and 2006. Scarborough knew that, contrary to her representations, these investors were in fact "investing in Sheila Kennedy" rather than in real estate. When the promissory notes became due, K. Kennedy, S. Kennedy, and Scarborough gave a variety of excuses for not having the funds necessary to pay the notes, including that the IRS had seized the bank account, that the government was "freezing" the money due to the large amounts involved and because of heightened security after the 9/11 terrorist attacks, that the money was "tied up" by a federal judge or local banks, and/or that the distribution of funds would be delayed due to S. Kennedy's serious illness. They also began assuring investors that the investments were safe because, even if the real estate transactions did not work out, everyone would be repaid from S. Kennedy's pending inheritance.

But those assurances led only to further successful solicitations of money from persons who had already invested in the fictitious real estate deals and from new investors. Both K. Kennedy and Scarborough also sought money to facilitate S. Kennedy's accessing her purported inheritance. They told investors that the money was needed to pay attorneys and back taxes, to satisfy an outstanding judgment against the estate, or for other vague but somewhat plausible reasons. In fact, Scarborough was using portions of the investors' funds for her own personal benefit, paying off credit card

debt and loans.  No investor received any return on his or her investment, and only one person had any amount of principal returned—and that was only after he threatened to swear out warrants against the Kennedys and Scarborough.  A few investors received items as collateral, such as a John Deere lawnmower, jewelry, guns, prints, and a coin collection.

By early 2006, S. Kennedy had met a financial planner in Tennessee named Philip Russell.  He soon joined the scheme and began soliciting his clients and friends to invest in S. Kennedy's purported real estate deals, assuring them that he had vetted S. Kennedy, that their investments were guaranteed, and that he had successfully invested his own money with S. Kennedy.  One friend and client of Russell, Deborah Kondis, invested more than $1 million by checks and wire transfers.  Some of these investors received checks in the mail that purported to be investment returns, but all the checks bounced.

S. Kennedy and Russell traveled together to New York City in June 2007 and lived for several months in hotels there and in Atlantic City.  Meanwhile, K. Kennedy remained in Kentucky soliciting more money, which he explained would go toward getting S. Kennedy's inheritance money released, toward getting money distributed from the real estate transactions, or toward paying for S. Kennedy's medical care and hospital stays in the northeast (the latter payments supposedly benefitting the investors by allowing S. Kennedy to continue the pursuit of the inheritance and real estate money).  K. Kennedy typically cashed the checks that he received from these solicitations and deposited them into an account belonging to Russell, who would then use the funds with S. Kennedy for personal spending.  K. Kennedy also prepared and transmitted purported legal documents related to the investment scheme and sent packages of promissory notes to S. Kennedy.

Despite the indictment of S. Kennedy and Russell in December of 2007 for their roles in this scheme, K. Kennedy and Scarborough continued to solicit funds from victims under the pretense of getting S. Kennedy's inheritance money released and distributed to all investors.  K. Kennedy also assisted S. Kennedy, who was released

pending trial, in purchasing two new vehicles with checks from an ASK, LLC account, which checks were returned for insufficient funds. He also assisted her in initiating the purchase of a $1.15 million home and with obtaining checks in their names that listed the not-yet-purchased home as their address. The transaction never closed because no funds were in fact available for the purchase.

## B.     Procedural background

In September 2010, a grand jury issued its fourth superseding indictment charging K. Kennedy and Scarborough with seven counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One through Seven), for transactions occurring between October 2005 and July 2006, and with five counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts Eight through Twelve), for mailings that occurred in mid-April 2007. Scarborough alone was indicted on one count of money laundering, in violation of 18 U.S.C. § 1957 (Count Twenty), for negotiating a $25,000 check for $20,000 in cash and depositing the remaining funds into two unspecified bank accounts. The two were tried together in a two-week jury trial that ended in October 2010. Arguing that the evidence presented was insufficient to convict them of the crimes charged, they both moved for an acquittal at the close of the government's proof pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court denied both motions.

At the close of all the proof, the district court submitted the case to the jury with instructions that any written communication to the court during the course of deliberations "should never state or specify the vote of the jury at the time." But the jury nonetheless sent a note during its deliberations stating that a specific number of jurors intended "not to vote guilty." The court informed counsel that it had received a jury note indicating the vote count, but the court did not reveal what that count was. With no objection from either defendant, the court called the jury back and issued an *Allen* charge, *see Allen v. United States*, 164 U.S. 492, 501-02 (1896), using Sixth Circuit Pattern Instruction 9.04.

The jury returned a verdict later that same day, convicting K. Kennedy on Counts Five through Twelve and convicting Scarborough on Counts One through Seven and on

Count Twenty. In other words, K. Kennedy was convicted on two of the wire-fraud counts and on all of the mail-fraud counts, whereas Scarborough was convicted only on the wire-fraud and money-laundering counts. K. Kennedy filed motions a week later to review the jury note in its entirety and for approval to interview the jurors, both of which requests were denied.

Both K. Kennedy and Scarborough objected at their respective sentencing hearings to the district court's calculations of the number of victims and amount of loss for which each defendant was responsible. The court found that they were responsible for the foreseeable consequences of the other actors participating in the scheme and imposed sentencing enhancements for losses in excess of $2.5 million and for an offense involving more than 50 victims. It also found that they both had used sophisticated means during the course of the scheme, which subjected them to another sentencing enhancement. Finally, Scarborough received an obstruction-of-justice sentencing enhancement for giving what the court concluded was perjured testimony at trial. They have each timely appealed.

## II.  ANALYSIS

### A.     Standards of review

Several standards of review apply to the issues in this case. First, the standard of review on appeal for an insufficient-evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). But that standard changes when the defendant fails to renew a Rule 29 motion "at the close of *all* evidence." *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989) (internal quotation marks omitted) (emphasis in original). Under those circumstances, the defendant "forfeit[s] his right to challenge the sufficiency of the evidence" unless the record reveals a "manifest miscarriage of justice." *Id.* (internal quotation marks omitted).

Next, a district court's findings of fact for the purpose of calculating a sentencing range under the Guidelines are reviewed under the clear-error standard. *United States v. Hamilton*, 263 F.3d 645, 651 (6th Cir. 2001). But "whether those facts as determined by the district court warrant the application of a particular guideline provision is purely a legal question and is reviewed *de novo* by this court." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) (internal quotation marks omitted). Finally, we review de novo the denial of a post-trial motion regarding a purely legal issue, *see United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010) (reviewing de novo post-trial motions raising purely legal issues of entrapment and manufactured jurisdiction), and review the district court's determination of the proceedings necessary to discover alleged jury misconduct under the abuse-of-discretion standard, *United States v. Griffith*, 17 F.3d 865, 880 (6th Cir. 1994).

**B.     Sufficiency of the evidence**

K. Kennedy and Scarborough moved for judgments of acquittal at the close of the government's proof, arguing that the evidence presented was insufficient to sustain their convictions. *See* Fed. R. Crim. P. 29(a). The district court considered and denied the motions, and neither defendant renewed his or her respective motion at the close of all the evidence, *see Swidan*, 888 F.2d at 1080, or within 14 days after their guilty verdicts, *see* Fed. R. Crim. P. 29(c)(1). They have thus failed to preserve their rights to challenge the sufficiency of the evidence in the absence of a miscarriage of justice. *See Swidan*, 888 F.2d at 1080; *see also United States v. Faymore*, 736 F.2d 328, 334 (6th Cir. 1984) (holding that the defendant's insufficient-evidence claim was barred by his failure to renew his Rule 29 motion at the close of all the evidence because there was no manifest miscarriage of justice). Both K. Kennedy and Scarborough conceded at oral argument that this highly deferential standard of review applies in the present case, and we have found no "manifest miscarriage of justice" in the record to warrant reversal of either defendant's convictions. *See Swidan*, 888 F.2d at 1080.

And even if K. Kennedy and Scarborough were entitled to a review of their insufficient-evidence claims under the *Jackson* standard, they have failed to show that,

viewing the evidence in the light most favorable to the government, a rational trier of fact could not have found the elements of each crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. A wire-fraud conviction requires proof that "the defendant devised or willfully participated in a scheme to defraud[,] . . . used or caused to be used an interstate wire communication in furtherance of the scheme[,] . . . and . . . intended to deprive a victim of money or property." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotation marks omitted). Mail fraud requires proof of a defendant's "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). This court has interpreted the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of the mails versus the wires. *United States v. Bibby*, 752 F.2d 1116, 1126 (6th Cir. 1985).

K. Kennedy contends that he solicited "loans" rather than "investments," and that he neither was aware of a scheme nor had the intent to defraud anyone. His first contention provides no support for his insufficient-evidence claim because he fails to show any legally material distinction between the two terms. A victim can just as easily be deprived of money or property through a fraudulent loan as through a fraudulent investment.

His second contention, which amounts to a "good-faith" argument, fares no better. The government introduced witness testimony and bank records from which the jury could have concluded that K. Kennedy was aware of the scheme and was intentionally furthering it through his many solicitations, the transfer of victim funds, the preparation and transmission of purported legal documents, and the mailing of promissory notes. *See, e.g.*, *United States v. Goodpaster*, 769 F.2d 374, 378 (6th Cir. 1985) (describing circumstantial evidence from which a jury could infer the requisite intent for mail fraud). Moreover, the "belief or faith that a venture will eventually succeed no matter how impractical or visionary the venture may be" is no defense to a charge of fraud. *United States v. Stull*, 743 F.2d 439, 446 (6th Cir. 1984).

At the very least, a rational juror could have found that K. Kennedy's material misstatements to victims regarding the existence of an inheritance purportedly due his wife were reckless.  He had never seen any document evidencing such an inheritance, and he knew that his wife had been sued in the past for making false representations regarding an alleged inheritance.  The government met the mail- and wire-fraud statutes' intent requirements through proof that K. Kennedy was reckless in his disregard for the truth of the statements that he made to victims to obtain their money.  *See United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) (holding that the prosecution may establish the intent element of mail fraud by proving that the defendant was reckless); *see also United States v. Turner*, 22 F. App'x 404, 410 (6th Cir. 2001) (noting that the government's evidence in a mail-fraud case met the intent requirement because it supported a jury finding that the defendant "deliberately ignored a high probability" that the securities form he submitted contained material false information).

Scarborough's good-faith defense—that she "believed every word from S. Kennedy"—likewise fails.  She admitted to the investigating agents that obtaining money through purported real estate deals was her idea and that she continued to mislead current and potential investors even after she knew that S. Kennedy's one "land option" had lapsed.  Moreover, Scarborough's contention that she did not obtain the money for her own benefit is irrelevant because obtaining money for one's personal use is not an element of wire or mail fraud.  *See Faulkenberry*, 614 F.3d at 581 (listing the elements of wire fraud); *Frost*, 125 F.3d at 354 (listing the elements of mail fraud).  This contention is also contradicted by her statements to the investigating agents that she used a portion of the victim funds to make personal credit-card and loan payments.

In sum, even if K. Kennedy and Scarborough had fully preserved their insufficient-evidence challenges, we would still conclude that the evidence was sufficient to establish that they were both willful participants in a scheme to defraud and that the use of the mails and wires by the other participants were foreseeable and in furtherance of the scheme.  *See, e.g.*, *Frost*, 125 F.3d at 362 ("[A] mailing may support a mail fraud conviction as long as the defendant knew that use of the mails would follow

in the ordinary course of business, or that a reasonable person would have foreseen use of the mails.").  We therefore reject their insufficient-evidence claims.

**C.     Reviewing the jury note and interviewing jurors**

K. Kennedy separately challenges the district court's denial of his post-trial motions to review the note sent by the jury and to interview individual jurors.  He contends that the denial prejudiced him because the information that he anticipated gathering from the note and the juror interviews would likely show that the jury reached an impermissible "compromise verdict."  Scarborough echoes this argument in her brief, but she did not join in the motions below or file her own motions.  Her argument is therefore forfeited on these two issues because she raised them for the first time on appeal.  *See United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006) (noting this court's general rule that arguments not first raised in the district court are forfeited).

**1.     *Jury note***

With regard to the note from the jury, K. Kennedy argues that Rule 43 of the Federal Rules of Criminal Procedure, which codifies a defendant's right under the Sixth Amendment's Confrontation Clause and the Fifth Amendment's Due Process Clause to be present at all critical stages of the trial, *United States v. Taylor*, 489 F. App'x 34, 43 (6th Cir. 2012), confers a right to have access to all communications between the judge and the jury.  Although numerous courts have indeed recognized a defendant's right to be made aware of such communications, *see, e.g.*, *United States v. Mejia*, 356 F.3d 470, 474 (2d Cir. 2004), they have likewise recognized that courts are not required to reveal vote counts, *see, e.g.*, *United States v. Henry*, 325 F.3d 93, 106 (2d Cir. 2003) (noting that the district court should have informed counsel that it was redacting the vote count from a jury note, but that the failure to reveal the vote count itself was not an abuse of discretion); *United States v. Warren*, 594 F.2d 1046, 1049 (5th Cir. 1979) ("The district court did not err in failing to disclose the vote of the jury.").

The First Circuit's decision in *United States v. Maraj*, 947 F.2d 520 (1st Cir. 1991), lends some support to K. Kennedy's argument, but ultimately demonstrates that

the district court's handling of the jury note in the present case was proper.  According to the First Circuit, the district court erred when it disclosed the jury's request for a copy of a sworn statement but omitted a portion of the jury's note that stated:  "There is only one person who has a doubt as to this."  *Id.* at 525-26.  The parties were not informed that any portion of the note had been omitted.  *Id.* at 525.

In contrast, the district court in the present case told counsel that the jury had, contrary to the court's instructions, revealed a vote split.  This gave K. Kennedy the immediate opportunity to argue that he should be told the vote count so that he could make an informed objection to the court's proposed *Allen* charge.  But he failed to do so. Learning that there was a vote split also afforded K. Kennedy (and Scarborough) the chance to seek a plea bargain with the government.

Moreover, *Maraj* relied in part on a Second Circuit en banc decision, *id.* at 526 (citing *United States v. Robinson*, 560 F.2d 507, 516 (2d Cir. 1977)), in which the majority found that "there was little or no need for [the district court] to consult with counsel concerning [the court's] response" to a jury note that revealed a vote split. *Robinson*, 560 F.2d at 516.  And even the dissenting judges in *Robinson* noted that the district court "should have revealed to counsel the substance of the juror's note, *without disclosing the individual juror's name or the jury vote*."  *Id.* at 524 (Oakes, J., dissenting) (emphasis added).  That is exactly what the district court did in the present case.

In sum, K. Kennedy cites no authority that unequivocally supports his proposition that he had the right to know the vote count revealed in the jury note.  And even in *Maraj*, his best supporting case, the error was found to be "harmless beyond any reasonable doubt."  947 F.2d at 526.  We thus follow the precedent of the Second and Fifth Circuits in concluding that the district court's denial of K. Kennedy's motion to review the entire jury note was not erroneous.

### 2.     *Juror interviews*

K. Kennedy also sought permission from the district court to interview jurors "for the sole purpose of determining whether a compromise verdict was returned in this case."  He speculates that the convictions on some counts but acquittals on others indicate that the jury was not unanimous regarding any of the counts.  But even if his speculation is accurate, it would provide no basis for interviewing the jurors because juror testimony with regard to a verdict's validity is limited to whether "extraneous prejudicial information was improperly brought to the jury's attention; an outside influence was improperly brought to bear on any juror; or a mistake was made in entering the verdict on the verdict form."  Fed. R. Evid. 606(b).

K. Kennedy's theory of a compromise verdict fits none of these exceptions. Rather, it is an allegation of improper "internal influence," which this court has held cannot provide a basis for post-verdict juror interrogation.  *See United States v. Logan*, 250 F.3d 350, 380-81 (6th Cir. 2001) (holding that juror interviews were not permissible where the alleged jury misconduct of premature deliberations constituted internal influence); *Helm v. Bunch*, No. 88-5120, 869 F.2d 1490, 1989 WL 20403, at *7 (6th Cir. March 8, 1989) (unpublished) (concluding that a juror's affidavit about the jury reaching a compromise verdict was "clearly prohibited by Rule 606(b)").

## D.     Sentencing enhancements

### 1.     *Amount of loss and number of victims*

We now turn to the challenged enhancements under the U.S. Sentencing Guidelines.  K. Kennedy and Scarborough both object to the amount-of-loss and number-of-victim calculations that the district court adopted for the purpose of determining their sentences.  Scarborough argues that the court should have held her responsible for only the losses of which she was specifically aware, and both she and K. Kennedy contend that the jury's verdict limits the scope of the losses that the court may attribute to them.  But the Guidelines provide that a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity," whether or not that activity is charged as a conspiracy. U.S.S.G. § 1B1.3(a)(1)(B).  A district court must make "particularized findings with respect to both the scope of the defendant's agreement and the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy."  *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphases omitted).

The district court made such findings with respect to both K. Kennedy and Scarborough.  Neither has pointed to any facts in the record showing that the district court's findings were clearly erroneous.  *See United States v. Hamilton*, 263 F.3d 645, 651 (6th Cir. 2001) (explaining that findings of fact from a sentencing hearing will not be set aside unless clearly erroneous).  Nor does either one offer a convincing argument for why any losses in the course of the scheme were outside the scope of his or her agreement to participate in the scheme or were not foreseeable.  *See Campbell*, 279 F.3d at 400.  Both contend that they were unaware of Russell's activities and thus should not be held responsible for losses suffered by the victims that Russell solicited.  But the government's evidence showed that Scarborough deposited into the ASK, LLC bank account one check from a Russell victim and another check written by Russell himself. The evidence also showed that K. Kennedy received money from the ASK, LLC account and that he deposited some of the funds that he solicited from other victims into an account held by Russell, indicating his awareness of (and his benefitting from) Russell's participation in the scheme.

Both K. Kennedy and Scarborough fully participated in the fundamental aspect of the scheme—convincing victims to part with their money using promises of guaranteed (and typically exorbitant) returns from fictitious real estate deals or the inheritance purportedly due S. Kennedy.  This was not a case in which the defendants agreed to play only a minor role in a larger scheme.  The district court's specific findings were sufficient to apply sentencing enhancements for both of them based on their responsibility for more than $2.5 million in losses from more than 50 victims.  *See* U.S.S.G. § 2B1.1(b)(1)(J) and § 2B1.1(b)(2)(B).

### 2.       *Sophisticated means*

K. Kennedy and Scarborough next argue that the district court erred in applying a two-level enhancement for the use of sophisticated means, *see* U.S.S.G. § 2B1.1(b)(10)(C), because their specific conduct, according to them, was not "especially complex or especially intricate." To the contrary, the district court identified conduct by each of them that it found was "sophisticated." K. Kennedy was directly involved in wire transactions, preparing various sham legal documents, handling promissory notes, and restructuring deposits to avoid bank-reporting requirements. Scarborough solicited numerous investors by the use of promissory notes and based her solicitations on purported interstate real estate transactions. The district court's conclusion that such activities constituted "sophisticated means" is not clearly erroneous.

### 3.       *Obstruction of justice*

Finally, the district court applied a two-level enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, in its calculation of the Guidelines range for Scarborough's sentence. This enhancement is properly applied when the court finds that the defendant committed perjury in relation to the offense of conviction. U.S.S.G. § 3C1.1 cmt. n.4(B). "[T]he court must 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Boring*, 557 F.3d 707, 712 (6th Cir. 2009) (internal quotation marks omitted). Those elements are "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* (internal quotation marks omitted).

Scarborough argues that what she said at trial was exactly the same as what she said in her interview with the investigating agents. But the record, as the district court noted, indicates otherwise. Scarborough testified that she believed that the real estate transactions she was offering were legitimate and that she did not suggest the land-investment scheme to S. Kennedy. This testimony contradicted her statements to the

investigating agents that "she came up with the idea of [a] land option because she did not think people would loan them [S. Kennedy and Scarborough] money," and that "she knew that she misled investors by telling them that they were investing in a land option." Scarborough's false testimony was material because it went to the heart of her intent to defraud. And her testimony did not appear to be the result of confusion, mistake, or faulty memory. *See Boring*, 557 F.3d at 712. The court's application of the obstruction-of-justice enhancement was thus appropriate.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.