**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0719n.06

**No. 12-3592**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Aug 06, 2013***

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| JOHNNY SUGGS, | ) | |
| | ) | OPINION |
| Defendant – Appellant. | ) | |
| | ) | |

Before:  KEITH, WHITE, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge.  A jury convicted Johnny Suggs of conspiracy to commit mortgage fraud and bank fraud, making a false statement to a bank, bank fraud, mail fraud, and passing U.S. Treasury checks with forged endorsements.  He challenges these convictions on four grounds:  (1) the evidence was insufficient to prove the endorsements on the U.S. Treasury checks were forged and that he knew they were forged; (2) the district court violated his confrontation rights and the hearsay rule when it admitted a document and witness testimony relating to the forged check endorsements; (3) the jury venire was not drawn from a fair cross-section of the community, in violation of his Sixth Amendment rights; and (4) the district court erroneously denied his pretrial motion to re-evaluate his competency to stand trial.   We AFFIRM the convictions.

1

## I. FACTS AND PROCEDURAL HISTORY

The trial proof showed that, from September 1998 through September 2005, Suggs and others engaged in a conspiracy to obtain mortgage loans on high-priced residential properties by presenting fraudulent applications and income documentation to lending institutions. Suggs and his co-conspirators represented to lenders that they earned substantial monthly compensation as employees of the James and Albert Group, LLC or the James and Albert Corporation, but these companies were sham entities that did not engage in any legitimate business activities. After obtaining a mortgage loan and taking ownership of a residence, Suggs lived at the location without paying the mortgage until the bank took possession of the property through a foreclosure action or he sold the home to a co-conspirator at an inflated price—obtaining a second fraudulent mortgage loan from a different lender in the process—taking the "equity" in cash. The scheme defrauded federally insured banks and mortgage lending companies.

Using false documentation supplied by Suggs, Carlos Crespo purchased a multi-family property. After taking possession of the property, Crespo and his grandmother, Aida Cardona-Cruz, who is now deceased, lived in downstairs apartments, while Suggs inhabited an upstairs apartment. Cardona-Cruz received monthly Supplemental Security Income (SSI) checks from the federal government. While she was visiting relatives in Puerto Rico for several months in 2004, Crespo retrieved two of the SSI checks from the mail and cashed them, purportedly with the consent of Cardona-Cruz. Five more SSI checks bearing forged endorsements were deposited into bank accounts Suggs controlled.

The indictment charged Suggs in eight counts, including conspiracy under 18 U.S.C. § 371 (count 1); making a false statement to a bank in violation of 18 U.S.C. §§ 1014 & 2 (count 2); bank

fraud in violation of 18 U.S.C. §§ 1344 & 2 (counts 3, 4, and 6); mail fraud in violation of 18 U.S.C. §§ 1341 & 2 (count 5); passing, uttering, or publishing U.S. Treasury checks bearing falsely made or forged endorsements exceeding an aggregate face value of $1,000 in violation of 18 U.S.C. §§ 510(a)(2) (count 7); and making, uttering or possessing a counterfeit or forged Sprint check in the amount of $1,200 in violation of 18 U.S.C. §§ 513(a) and 2. R. 1. Before trial, the government voluntarily dismissed counts 4, 6, and 8 and struck from count 7 one of the six U.S. Treasury checks listed in that count. Prosecutors presented the testimony of eighteen witnesses and introduced into evidence numerous exhibits. Suggs testified in his own defense, but he did not call any witnesses or present any new exhibits.

The jury returned guilty verdicts on counts 1, 2, 3, 5, and 7 as charged, finding specifically with regard to count 7 that Suggs, with the intent to defraud, passed five of Cardona-Cruz's SSI checks bearing false or forged endorsements. The district court sentenced Suggs to 60 months of imprisonment on each count, to be served concurrently, followed by three years of supervised release. The court also ordered Suggs to pay joint and several restitution to financial institutions in the amount of $869,731.00. We have jurisdiction of this timely appeal under 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Forged endorsements on U.S. Treasury checks

Suggs challenges the sufficiency of the evidence to convict him on count 7 of the indictment. Count 7 charged that, between August 10 and December 31, 2004, Suggs knowingly and with intent to defraud passed, uttered, or published one or more U.S. Treasury checks with an aggregate face value exceeding $1,000.00 and that those checks bore falsely made or forged endorsements or signatures.

3

The applicable statute provides that "[w]hoever, with intent to defraud . . . passes . . . any Treasury check . . . of the United States bearing a falsely made or forged endorsement or signature[] shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. § 510(a)(2). "If the face value of the Treasury check . . . or the aggregate face value, if more than one Treasury check . . . , does not exceed $1,000 . . . the penalty shall be a fine under this title or imprisonment for not more than one year, or both." 18 U.S.C. § 510(c).

We ordinarily review a challenge to the sufficiency of the evidence by considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Kennedy*, 714 F.3d 951, 956–57 (6th Cir. 2013). But we do not employ that standard of review if a defendant makes a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 at the end of the government's case-in-chief, but fails to renew the motion at the close of all the evidence. *See Kennedy*, 714 F.3d at 957.

Suggs moved for judgment of acquittal under Rule 29 at the close of the government's evidence, but he did not renew the motion at the close of all the evidence. The omission results in a forfeiture of his right to challenge the sufficiency of the evidence to support conviction under count 7 unless the record demonstrates a "manifest miscarriage of justice." *Kennedy*, 714 F.3d at 957 (quoting *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989)). We will reverse the conviction only if the record is "devoid of evidence pointing to guilt." *United States v. Kuehne*, 547 F.3d 667, 697 (6th Cir. 2008) (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)).

Before delving into the trial evidence in support of count 7, we must address a discrepancy in the parties' views concerning the elements the government must prove beyond a reasonable doubt

4

to obtain a conviction under § 510(a)(2).  Without citation to authority, Suggs contends the government was required to prove five elements:  (1) the defendant passed or uttered a forged U.S. Treasury check; (2) the Treasury check bore a falsely made or forged endorsement; (3) the defendant knew the Treasury check bore a falsely made or forged endorsement; (4) the defendant had the intent to defraud; and (5) the face value of the Treasury check or the aggregate face value of the Treasury checks totaled more than $1,000.00.  Appellant's Br. at 15.  By contrast, the government asserts it is not required to prove that the defendant knew the Treasury checks bore falsely made or forged endorsements; rather, it must prove four elements only:  the first, second, and fourth elements listed above and that the defendant acted knowingly and willfully.

The government's formulation of the elements on appeal, which is borrowed from *Bobb v. Attorney General*, 458 F.3d 213, 227 (3d Cir. 2006) (citing *United States v. Rosario*, 118 F.3d 160, (3d Cir. 1997)), fails to include the requirement that the government prove the aggregate face value of the Treasury checks exceeded $1,000.00.  The statute requires such proof to obtain a felony conviction.  18 U.S.C. § 510(a)(2) & (c).  The Third Circuit noted in *Bobb* that the monetary element was met in that case because the defendant pled guilty to an indictment establishing a loss greater than $10,000.00.  *Bobb*, 458 F.3d at 227.  Though not at issue in *Bobb*, proof of value exceeding $1,000.00 is a necessary element of the felony offense.

We have not had occasion to decide whether, to obtain conviction under § 510(a)(2), the government must prove that the defendant knew the Treasury check bore a falsely made or forged endorsement or signature.  The Third Circuit did not require such proof in *Rosario* and *Bobb*, nor did the Second Circuit require it *United States v. Hopkins*, 853 F.2d 118, 119 (2d Cir. 1988) (per curiam).  In *Hopkins*, the court reasoned that the language of § 510(a)(2) does not impose any

"requirement that a person who passes a Treasury check with a forged endorsement specifically know that the endorsement is forged." *Id.* The court found "no reason to believe that Congress intended anything other than the express language of the statute, and no reason for us to inquire beyond those words." *Id.*

Tracking the express language of § 510(a)(2), count 7 of the indictment against Suggs did not specifically charge that Suggs knew the Treasury checks bore false or forged endorsements or signatures. But the government's proposed jury instruction on count 7 included as the third element "that defendant knew that the Treasury check bore a falsely made or forged endorsement." The district court read the government's proposed instruction to the jury with only minor stylistic changes and neither party objected. This explains why Suggs now repeats on appeal the same five elements the district court read to the jury. The legal basis for giving the instruction is not revealed in the record, but because the government specifically requested and received an instruction that required it to meet a higher burden than the statute may require, we will measure the government's proof in this case against that higher burden. The parties have not requested a specific ruling delineating the elements of the crime, and we do not render a definitive ruling on whether § 510(a)(2) requires the government to prove that the defendant knew the Treasury check bore a false or forged endorsement or signature.

Turning again to the evidence, Suggs contends that the government failed to prove the endorsements on the five Treasury checks were falsely made or forged and that he knew they were; that he intended to defraud the government; and that the aggregate face value of the checks exceeded $1,000.00. He also contends that one Treasury check introduced into evidence was dated outside the time frame specified in count 7 of the indictment. The trial evidence contradicts each of these

6

arguments. Because the record is not devoid of evidence pointing to Suggs's guilt, we conclude there has not been a manifest miscarriage of justice warranting reversal of the conviction on count 7 for insufficient evidence. *See Kennedy*, 714 F.3d at 957; *Kuehne*, 547 F.3d at 697.

The government proved that the endorsements on the five Treasury checks were not the signatures of the named payee, Aida Cardona-Cruz, and that Suggs knew the endorsements were falsely made or forged. According to the evidence, in late 2003 Suggs helped Cardona-Cruz's grandson, Carlos Crespo, take ownership of a building at 3460 West 58th Street in Cleveland, Ohio, by submitting false documentation to a lending institution to obtain a mortgage. Suggs, Crespo, and Cardona-Cruz all lived in separate apartments at that address. At that time, Cardona-Cruz was in her seventies and suffering from memory loss. She did not know Suggs or have any relationship with him. A native Puerto Rican, Cardona-Cruz spoke Spanish and little English. She received monthly SSI checks from the U.S. Treasury. For several months in mid- to late-2004, Cardona-Cruz lived in Puerto Rico, but she failed to notify the Social Security Administration to stop sending checks to her Ohio address.

The apartment mailboxes at Crespo's property sat near each other, and Suggs put the names of his fictitious entities on three of them. According to Crespo, Suggs "was always pretty much paying attention to the mail." When Cardona-Cruz's June 2004 SSI check arrived in the mail, Suggs handed the check to Crespo, who cashed it at Gas USA. Crespo claimed he did so with his grandmother's permission, keeping $150 as rent and sending her the rest. In July 2004 Crespo asked Suggs to retrieve Cardona-Cruz's SSI check from the mail and slide it under Crespo's apartment door, and Suggs complied. Crespo also cashed that check at Gas USA. Thereafter, Crespo did not receive his grandmother's SSI checks. He asked Suggs if he had seen the checks, but Suggs told him

7

that none had arrived in the mail. Crespo could not think of any reason why Suggs would have the checks. When a Secret Service agent approached Crespo to inquire about Cardona-Cruz's cashed SSI checks, Crespo admitted that he signed and cashed the first two, but he thought the government stopped sending the checks after his grandmother moved away. Crespo repaid Gas USA for the two checks he cashed there.

After Cardona-Cruz returned from Puerto Rico in late 2004, she moved to Michigan to live with her granddaughter, Elizabeth Crespo-Pattah. Cardona-Cruz did not remember whether she had closed her social security case when she went to Puerto Rico. On January 18, 2005, Crespo-Pattah accompanied her grandmother to the local social security office where they learned that her case was still open, her SSI checks were being delivered to her old apartment in Cleveland, and the checks had been cashed.

The agency representative asked Cardona-Cruz to complete a form relating to the September 2004 check for the purpose of starting an investigation. This form warned the claimant that she could be prosecuted under federal law for making a false statement or claim. Crespo-Pattah translated and explained the form to her grandmother, and then filled in the answers to the questions as Cardona-Cruz gave them. Cardona-Cruz understood why the form was being completed, and she signed it. Crespo-Pattah signed the form as a witness to her grandmother's signature. Just above the signature lines, the form stated that the claim was being made for the proceeds of the check and warned that legal action could ensue if the claimant received and cashed checks to which she was not entitled. On the second part of the form, Cardona-Cruz certified that she answered the questions truthfully to the best of her knowledge, again signed the form, and presented three more examples

of her signature. The social security representative also required Cardona-Cruz to provide a handwriting exemplar that consisted of multiple repetitions of her signature.

Crespo-Pattah authenticated the claim form and the handwriting exemplar during her testimony. Having assisted Cardona-Cruz with her business matters between 2003 and 2005 and having witnessed Cardona-Cruz write her signature numerous times, Crespo-Pattah was very familiar with her grandmother's handwriting and signature.

Crespo-Pattah and Cardona-Cruz later returned to the social security office to examine six to eight SSI checks made payable to Cardona-Cruz that had been endorsed by someone and passed. The endorsements did not match Cardona-Cruz's signature. At trial the prosecutor introduced into evidence the checks for the months of September through December 2004, and January 2005. The January check was dated December 30, 2004, and deposited on December 31, 2004, within the time frame charged in count 7 of the indictment.

Crespo-Pattah testified that the endorsements on the five checks did not match Cardona-Cruz's signature because of a difference in handwriting and because Cardona-Cruz customarily signed both of her last names. Three of the five checks were endorsed "Aida Cardona." Crespo-Pattah did not know who actually endorsed the checks. Cardona-Cruz did not know Suggs and Crespo-Pattah could think of no reason why Suggs would have possession of Cardona-Cruz's SSI checks. Crespo-Pattah explained that Cardona-Cruz endorsed the February 2005 check, which was received at their Michigan address.

The prosecution also presented testimony of Yvette Feliciano from the Cleveland office of the Social Security Administration. She conducted an investigation into Cardona-Cruz's missing checks. By reviewing the documents in the agency's file, Feliciano knew that Cardona-Cruz had

visited a social security office to inquire about her checks. She told the jury that Cardona-Cruz signed a claim form under penalty of perjury stating that she did not cash any of the checks because she was in Puerto Rico and she did not authorize anyone else to cash the checks on her behalf. Feliciano authenticated Government Exhibits 12 through 16 as the five SSI checks made payable to Cardona-Cruz that Cardona-Cruz swore she did not receive or cash.

Federal agent Jeffrey Maslar testified that, during execution of a search warrant at Suggs's home, he showed Suggs a copy of Cardona-Cruz's September 2004 SSI check. Suggs admitted that he forged the endorsement of Cardona-Cruz.

Other evidence confirms that the five checks were deposited into bank accounts controlled by Suggs and that the face value of the checks totaled $2,835.00. Jennifer Mattingly, loss prevention manager for PNC Bank's northern Ohio market, told the jury that she examined the bank records and signature card for a money market savings account known as the Vandever Revocable Living Trust of Deleware [sic] (VLT). The account documents listed Suggs as the trustee for the account. To open the account on June 18, 2004, Suggs was required to show identification. He deposited one penny that day and in August deposited $25. On September 17 and October 1, 2004, Suggs deposited Cardona-Cruz's September and October SSI checks, each in the amount of $564, into his VLT account. When Suggs closed the account on November 1, 2004, it was overdrawn by $97, resulting in a loss to the bank.

Nora Koepf, an investigator with Charter One Bank, testified about bank records relating to a checking account held in the name of James & Albert Group LLC, a fictitious business created by Suggs. Suggs deposited three of Cardona-Cruz's SSI checks—two in the amount of $564 and one

10

in the amount of $579—into this account for the months of November and December 2004 and January 2005.

All of this evidence supports the jury's finding beyond a reasonable doubt that the endorsements on five of Cardona-Cruz's U.S. Treasury checks issued between September 1, 2004 and December 30, 2004, were forged. Because Suggs admitted to a federal agent that he forged one check and because all five checks were deposited into bank accounts he controlled, the jury reasonably could have inferred that Suggs forged the other four checks or that he knew they were forged. The government produced witnesses who authenticated Cardona-Cruz's signature on the social security claim form and the handwriting exemplar. Federal Rule of Evidence 901(b)(3) permits lay persons serving on the jury to compare signatures on documents with other signatures that have been authenticated. *See United States v. Saadey*, 393 F.3d 669, 679 (6th Cir. 2005). By this method, the jury was able to compare the endorsements on the five checks deposited into Suggs's accounts against the authenticated signatures of Cardona-Cruz. The jury was also able to compare the endorsements on the five checks deposited into Suggs's accounts with the endorsements on the two checks Carlos Crespo admitted passing. The prosecution was not required to produce an expert witness to give an opinion about the handwriting on the various documents. *Id.*

In weighing the credibility of the witnesses, the jury resolved any discrepancies in the testimony concerning whether Cardona-Cruz gave Carlos Crespo permission to cash her checks. The jury rationally could have rejected Suggs's testimony that he did not forge the checks, that he did not know the checks were forged, and that he deposited the checks into accounts he controlled only because Carlos Crespo asked him to cash the checks. Finally, the jury reasonably found, based on

11

the evidence, that Suggs had the intent to defraud the government and that the aggregate face value of the U.S. Treasury checks deposited into Suggs's accounts exceeded $1,000.00.

We find no merit in the contention that Suggs was prejudiced by the introduction into evidence of Cardona-Cruz's February 2005 SSI check. Suggs did not object to admission of the exhibit, but in any event Elizabeth Crespo-Pattah testified that Cardona-Cruz received the check in Michigan and endorsed it. The prosecution did not use this check dated outside the time frame specified in count 7 to obtain conviction on that count. The check was offered to show Cardona-Cruz's authentic endorsement on an SSI check received after she changed her address at the social security office.

Because the record contains strong evidence of guilt and is not devoid of evidence that Suggs committed the crime charged under § 510(a)(2), we conclude there has not been a manifest miscarriage of justice warranting reversal of the conviction on count 7 for insufficient evidence. *See Kennedy*, 714 F.3d at 957; *Kuehne*, 547 F.3d at 697.

## B. Confrontation rights and hearsay exception

Suggs next argues that the district court erred in permitting Elizabeth Crespo to testify about Cardona-Cruz's missing social security checks and in admitting into evidence Government Exhibit 18, the claim form Cardona-Cruz submitted to the Social Security Administration about the missing September 2004 check. He contends this evidence constituted inadmissible hearsay and violated his confrontation rights under the Sixth Amendment. *See Crawford v. Washington*, 541 U.S. 36 (2004).

The district court denied Suggs's pretrial motion in limine seeking to exclude this evidence. The court ruled that Elizabeth Crespo-Pattah could "testify if she has personal knowledge of what

12

went on with respect to these Social Security checks." R. 131 Page ID 1280. Relying in part on *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004), the court characterized the claim form as non-testimonial, rejecting Suggs's position that admitting the exhibit into evidence would violate the Confrontation Clause. The court nonetheless cautioned the prosecution "not to go too far." *Id.* at 1281.

We ordinarily review the district court's evidentiary rulings for an abuse of discretion, *see United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009), but we "review de novo claims that the admission of evidence violated the Confrontation Clause." *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009).

The Confrontation Clause bars the admission of out-of-court testimonial statements made by an unavailable witness that are offered to prove the truth of the matter asserted if the defendant did not have a previous opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 53–54; *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). If a statement is not testimonial, Confrontation Clause principles do not apply. *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007); *Johnson*, 581 F.3d at 325.

Testimonial statements are "directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Davis*, 547 U.S. at 826. In deciding whether a statement is testimonial, we ask "whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the

13

declarant's position would anticipate [her] statement being used against the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675.

Cardona-Cruz signed the claim form and provided a handwriting exemplar at the request of the Social Security representative in the ordinary course of business for the purpose of launching an agency investigation into a missing check. Her signature itself was not hearsay, was not testimonial, and its admission did not violate Suggs's confrontation right. The claim form itself is properly characterized as a business or public record of the Social Security Administration. *See* Fed. R. Evid. 803(6) & (8); *United States v. Miller*, 394 F. App'x 18, 21 (4th Cir. 2010) (noting social security employee, although not the records custodian, could authenticate records from a social security file).

Assuming arguendo that the assertions in the claim form were testimonial hearsay, we conclude nevertheless that admission of the form was harmless error. *See United States v. Henderson*, 626 F.3d 326, 334 (6th Cir. 2010) ("[A]n error may be deemed harmless if the record contains substantial evidence apart from the improperly admitted evidence so that there is no reasonable probability that the admission made a difference to the jury's verdict."). It was clear that Cardona-Cruz's checks were deposited in Suggs's account and Suggs admitted doing so. The core issue involved a credibility contest between Suggs and Carlos Crespo—whether Suggs cashed and deposited the checks at Crespo's request with the understanding that Crespo had the authority to do so. Crespo admitted that he had no such authority, denied endorsing the checks at issue, and claimed that he asked Suggs, who lived in the same building, whether the checks had arrived in the mail and Suggs denied that they had. Suggs testified that he did not live in the building, that Crespo's father began collecting the checks so Crespo asked Suggs to intercept the checks before his father could get them, that he did so and slid the checks under Crespo's door until Crespo asked him to cash the

14

checks, and that he never endorsed the checks and did not profit from the proceeds. Suggs's testimony is inconsistent with the evidence that the checks were endorsed by someone and deposited in his account, and there were no missing checks that might have been taken by Crespo's father. The SSI form added nothing to the evidence except Cardona-Cruz's assertion that the checks were cashed without her permission, which was clear from the other evidence without regard to the statements on the form. *See id.*

Further, Elizabeth Crespo-Pattah did not repeat in court any out-of-court statements Cardona-Cruz made. Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *United States v. Boyd*, 640 F.3d 657, 663 (6th Cir. 2011). Crespo-Pattah communicated to the jury her own personal knowledge about events relating to her grandmother's missing SSI checks, never straying from the scope of testimony imposed by the district court when it denied Suggs's motion in limine. At no point during her testimony did defense counsel make a hearsay objection. Accordingly, we conclude that the district court did not err in admitting Crespo-Pattah's testimony and that the admission of the claim form into evidence was harmless error.

## C. Jury venire

Suggs, an African American, next argues that his Sixth Amendment right to a jury chosen from a fair cross-section of the community was denied. He claims that African Americans are systematically underrepresented in the pool of potential jurors called for jury duty in the Northern District of Ohio at Cleveland. In his particular case, the jury venire included forty-six jurors, only two of whom were African American, and one of those two was excused for cause.

15

"Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review *de novo*." *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998). The Sixth Amendment demands that the jury venire represent a "fair cross-section" of the community. *Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

To show a prima facie violation of this requirement, Suggs must demonstrate "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Exclusion is "systematic" if it is "inherent in the particular jury-selection process utilized." *Id.* at 366. Once a defendant establishes a prima facie case, the government has the burden to justify the "infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id.* at 368.

Suggs's counsel first raised an issue about the racial composition of the jury venire during voir dire as the parties and the Magistrate Judge discussed challenges for cause. In response to the objection, the court responded: "The venire is what the venire is and there's [sic] ways to challenge that. Right now is not the appropriate way to challenge the venire." R. 130 Page ID 1125.

During trial, outside the presence of the jury, defense counsel made a short record to support the objection he made during voir dire. He presented statistics obtained from the 2010 United States Census for the Ohio counties of Lorain, Summit, Cuyahoga, and Lake showing that the African American population in those four counties combined is twenty-one percent. By comparison, the

16

African American composition of the jury venire was two to two and one-half percent. The prosecutor pointed out that the Northern District of Ohio includes more counties than the four mentioned. Defense counsel agreed, but he did not have statistics to present for the other counties. He stated his belief that the percentage of African Americans would be near twenty percent even if those counties were considered. Having not conducted the voir dire, the district court did not make any ruling.

Suggs's challenge to the composition of the jury venire fails because Suggs did not present any evidence that the underrepresentation of African Americans was due to systematic exclusion of that group in the jury-selection process, as required by the third element of his prima facie case. *See Duren*, 439 U.S. at 364, 366; *United States v. Smith*, 463 F. App'x 564, 571 (6th Cir. 2012). It is incumbent upon the defendant to show more than that a particular jury panel was unrepresentative. *See United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008); *Allen*, 160 F.3d at 1103. Suggs made no effort to show that systematic underrepresentation was "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366. Accordingly, we reject this challenge to the jury venire as a basis for setting aside the convictions.

**D. Competency to stand trial**

Finally, Suggs argues that the district court erred in finding him competent to stand trial, and that the court should have granted his motion for a competency re-evaluation. We review "the determination of whether there is reasonable cause to question a defendant's competence and to grant a competency hearing under an abuse of discretion standard." *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012). We examine the district court's factual findings concerning a defendant's competence for clear error. *Id.*

17

Suggs received a full competency evaluation under 18 U.S.C. § 4241(a) in September 2010 after the district court granted his request for an evaluation. The competency evaluator, Rodney B. Delaney, Ph.D., reviewed materials he received from various sources, conducted a series of interviews with Suggs over four days, and administered a battery of tests to Suggs. Dr. Delaney offered his opinion, with a reasonable degree of clinical certainty, that the psychological and emotional symptoms Suggs was experiencing did not rise to a level that would interfere with his ability to assist properly in his defense and that he was competent to proceed to trial. Upon receipt of the competency report and following a competency hearing, the district court ruled that Suggs was competent to stand trial.

The pretrial services office later referred Suggs to Edward Dutton, M.D., for a psychiatric evaluation. He issued a report on May 16, 2011, finding that Suggs was competent to stand trial. This document is not in the record so we cannot review it.

In the motion to re-evaluate competency filed on January 12, 2012, five days before trial, defense counsel represented that Suggs's behavior had become increasingly alarming, indicating that a competency re-evaluation was warranted. The district court held a hearing on January 17. Defense counsel called as a witness Suggs's treating psychiatrist, Dr. Olufunk Fajobi, but she declined to testify because she had been instructed not to release any information about Suggs. Upon questioning by the court, Suggs acknowledged that he had prohibited Dr. Fajobi from testifying, but later he gave the court permission to ask her a few limited questions. Dr. Fajobi had not treated Suggs in the prior thirty days or made any changes to his medication. She estimated she had not seen Suggs for two months, but he was scheduled to see her on a regular basis every three months.

Suggs next called as a witness Colleen Smith, a licensed professional clinical counselor. Suggs gave express permission for Smith to testify. She announced she was not qualified to render an opinion on mental competency to stand trial, but she stated she had counseled Suggs every two weeks for fifteen months for a total of thirty-three sessions as part of his pretrial services supervision. Although Suggs mentioned in the initial evaluation that he experienced "some hallucinations of sorts," she was not aware that Dr. Desai had diagnosed delusional disorder and unspecified psychosis on August 15, 2011. He was very consistent in attending counseling sessions and participated during the sessions. He never described delusions or hallucinations of any kind. Smith met with Suggs on December 5 and 20, 2011, and January 13 and 16, 2012. The sessions focused on managing his anxiety and frustration about going to trial. She felt Suggs's mood had improved over time and he was better able to control feelings of depression and anxiety. She believed Suggs demonstrated odd or eccentric personality traits. Suggs continued to take prescribed medication and demonstrated resourcefulness in solving personal problems. She did not notice during their sessions in the previous two months that he displayed any bizarre symptoms or diminished mental capacity. In addition to Smith's testimony, defense counsel referred the court to a May 5, 2010 Social Security Administration application indicating that Suggs suffered from psychosis and delusional disorder.

The court called as a witness Suggs's probation officer, Kara Cabanes, who began supervising Suggs in January 2010. She met with him personally at least once each month and had weekly telephone contact with him. She was aware that Suggs exhibited depressive symptoms due to an unstable housing situation, the upcoming trial, and physical ailments, but she did not observe any unusual or bizarre behavior that gave her concern. During the most recent visit on January 11,

19

2012, Suggs talked with her about his attorney and stated that he wanted to go to trial. She did not think he was unable to understand the case or that he would be unable to assist his lawyer at trial.

Based on this testimony, the district court denied the request for a re-evaluation of mental competency. Although Suggs's motion suggested that his competency had deteriorated, the court found the "unanimous and consistent" testimony indicated there had been no change in Suggs's behavior; if anything, he had improved. Having observed Suggs during the hearing, the court found that he was very attentive, pleasant, and suitably dressed. He answered questions appropriately and assisted his lawyer with information. The court stated "[h]e seems very much aware of who he is, where he is—he's nodding yes as I speak—and understands according to the testimony the gravity of the trial and the consequences of the trial." R. 92 Page ID 582. The court believed Suggs's anxiety about his upcoming trial was "a perfectly normal reaction." *Id.* at 582–83. The court considered medical evidence, as well as the treating physician's "laundry list of diagnoses" and Suggs's Social Security application, but the court did not identify any evidence justifying a mental re-examination. The court found Suggs was able to understand the proceedings against him and assist his counsel. Thus, the court found him competent to proceed to trial.

"A criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). Incompetency manifests in the lack of sufficient ability to consult with a lawyer with a reasonable degree of rational understanding or the inability to understand the criminal proceedings. *See United States v. Miller*, 531 F.3d 340, 348 (6th Cir. 2008). In determining a defendant's competence, the court must consider such factors as evidence of the defendant's irrational behavior, his demeanor in the courtroom, and any prior medical opinion relating to

20

competency to stand trial. *Id.* The court may also consider the opinion of the defendant's attorney. *See United States v. Tucker*, 204 F. App'x 518, 520 (6th Cir. 2006).

As required, the district court considered the testimony presented at the hearing, the prior competency evaluations, Suggs's Social Security disability application, medical records, the diagnosis of treating physicians, defense counsel's opinion of Suggs's competency as expressed in the motion, and Suggs's conduct in the courtroom. We are not persuaded that the district court's factual findings on competency made in light of all this evidence were clearly erroneous, *see Ross*, 703 F.3d at 867, or that Suggs's due process rights were violated by the court's decision to refuse a third mental competency examination. *See United States v. Redditt*, 87 F. App'x 440, 447–48 (6th Cir. 2003).

The fact that Suggs may have experienced some level of mental disorder did not necessarily render him incompetent to stand trial. *See Miller*, 531 F.3d at 349. Two previous competency evaluators opined that Suggs was competent to stand trial, and the witnesses at the January 2012 hearing did not confirm that Suggs's mental condition had deteriorated to the point that the trial should be postponed. There is no indication in the trial transcript that Suggs struggled with mental difficulties during trial. He rebuffed his attorney's advice on critical matters—once in rejecting a proffered plea agreement and once when taking the stand to testify—but rejection of legal advice does not establish incompetency, especially on this record. *See United States v. Moussaoui*, 591 F.3d 263, 294 (4th Cir. 2010) (noting a defendant has an absolute right to reject defense counsel's advice and doing so does not make him incompetent).

Suggs apparently had difficulty coping after the jury convicted him, requiring the court to change the conditions of his release pending sentencing. But the court did not find it necessary to

take Suggs into custody for his own protection, and in any event this post-trial development sheds little light on whether the district court's factual findings made on the day before trial were clearly erroneous. Having carefully reviewed the evidence on the competency issue, we decline to overturn the district court's decision.

## III. CONCLUSION

For all of the reasons stated, we find no justification to reverse these convictions. Accordingly, we AFFIRM the judgment.